1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

POINT RUSTON, LLC; MICHAEL A.
COHEN; and SILVER CLOUD, INC.,

Plaintiffs,

v.

PACIFIC NORTHWEST REGIONAL
COUNCIL OF THE UNITED
BROTHERHOOD OF CARPENTERS
AND JOINERS OF AMERICA; JOBS
WITH JUSTICE EDUCATION FUND
OF WASHINGTON STATE, a non-profit
corporation; JIMMY MATTA,
individually and as a representative of the
Regional Council; JACOB CARTON,
individually and as a representative of
Jobs with Justice; ADAM M. HOYT,
individually and as a representative of
Jobs with Justice; and DOES 1-50,

Defendants.

CASE NO. C09-5232BHS

ORDER DENYING
DEFENDANTS' MOTION TO
DISMISS

This matter comes before the Court on the motion to dismiss filed by Defendants

Jobs with Justice Education Fund of Washington State, Jacob Carton, and Adam M. Hoyt

(collectively "JWJ"). Dkt. 22.

The Court has considered the pleadings filed in support of and in opposition to the

motion and the remainder of the file and hereby denies the motion for the reasons stated

herein.

ORDER - 1

## I. FACTUAL AND PROCEDURAL BACKGROUND

Point Ruston, LLC, is a general construction contractor and property developer formed to provide management, development, and oversight services for the Point Ruston project. The Point Ruston project is a master planned mixed-use development constructed on a 97-acre site on the shores of Puget Sound, Washington. Plaintiff Silver Cloud, Inc., had an option to construct a hotel at Point Ruston.

### A. POINT RUSTON'S ALLEGATIONS

In the spring of 2008, Point Ruston entered into an agreement with Rain City Contractors, Inc. ("Rain City") to provide construction of concrete foundations and other concrete structures. While all other contractors retained by Point Ruston in 2008 were union contractors, Rain City was not a unionized employer. After Point Ruston contracted with Rain City, Defendant Pacific Northwest Regional Council of the United Brotherhood of Carpenters and Joiners of America ("Regional Council"), a labor organization, informed Point Ruston that it had a labor dispute with Rain City, "and that if Point Ruston continued to use Rain City on the project then the Regional Council would have a dispute with Point Ruston as well." Dkt. 1 at 7 (Plaintiffs' complaint). Point Ruston alleges that soon after it contracted with Rain City, Regional Council engaged in conduct designed to "compel Point Ruston to reassign concrete work being performed by Rain City to employees represented by the Carpenters Union." Dkt. 30 at 5 (Plaintiffs' response to JWJ's motion to dismiss).

When Point Ruston refused to break its contract with Rain City, demonstrators began appearing at Point Ruston's construction site and sales center to "distribute inflammatory flyers and leaflets prepared by the Regional Council and JWJ defendants." *Id.*, 5-6. JWJ is a non-profit corporation located in Tacoma, Washington. Dkt. 1 at 3. According to its website, JWJ is "a 14 year old coalition of over 154 member organizations and 5000 'I'll be there' individual pledgers fighting together for workers' rights and economic & social justice." Dkt. 22 at 15 (citation to website address omitted).

ORDER - 2

In addition to distributing the flyers and leaflets, "the demonstrators have trespassed on Point Ruston's project site and sales center, have picketed with large signs and banners and a large inflatable rat and have made intimidating, untruthful, and offensive comments to customers, prospective customers, employees of Point Ruston, contractors, suppliers and real estate professionals." Dkt. 30 at 6. Many of the leaflets referred to the JWJ website; this website included a statement that Michael Cohen, a Point Ruston managing member, was "spreading Asarco[1] dust in the surrounding community . . . . Mr. Cohen's track record is evasive, anti-worker and community, corrupting our democracy, and doused with grinchy behavior." Dkt. 1 at 9 (Plaintiffs' complaint). According to Plaintiffs, JWJ has also posted the following statement on its website, referring to a YouTube video: "Together, these videos demonstrate a disturbing health threat to condo buyers, neighbors, workers, P[oint] Ruston visitors and anybody in our community who makes contact with these people." Dkt. 1 at 10. Plaintiffs also allege that JWJ posted a separate message on its website that alleged that immigrant workers reported that Point Ruston engaged in "severe union-busting tactics" including threats of violence, mass firings, and other activities. *Id.* at 11.

In addition to these activities, Plaintiffs allege that JWJ and Regional Council engaged in additional wrongful conduct. *See generally*, Dkt. 1. For example, Plaintiffs maintain that Defendants also engaged in conduct designed to disrupt Point Ruston's sales and marketing activities. On March 28, 2009, Point Ruston and its realtor partner scheduled a breakfast cruise on Point Ruston's ferry, which Point Ruston used as a "marketing office." Participation in the breakfast cruise was by invitation only and limited to those individuals who were prospective buyers. After the ferry departed, Point Ruston representatives discovered that approximately six individuals who were not

---

[1] Asarco was the previous owner of the Point Ruston site. The site was previously designated a Superfund site by the EPA; from 1890 to 1986, the site had functioned as a lead and copper smelter. Dkt. 1 at 4.

registrants had also boarded the ferry under false pretenses. Two of these individuals were representatives of JWJ – Defendants Jacob Carton and Adam Hoyt. During a presentation, the individuals who boarded the ferry "became disruptive and began asking inflammatory questions that contained false allegations and suggestions intended to intimidate and discourage potential buyers." *Id*. at 19. According to Plaintiffs, one woman who had boarded the ferry made a statement that an individual had died as a result of complications from working at the Point Ruston site and that the site was toxic. *Id*. The individuals who boarded the ferry also handed out leaflets which depicted two rats with one of the rats stating, "Don't go to Point Ruston. It will kill you." *Id*.

**B.     SILVER CLOUD'S ALLEGATIONS**

On February 4, 2009, a Regional Council representative wrote a letter to Silver Cloud, informing the company that Regional Council had a labor dispute with Rain City, and that if Silver Cloud used Rain City on its project on the Point Ruston site, Regional Council would also have a dispute with Silver Cloud. *Id*. at 13. Regional Council further informed Silver Cloud that "several Rain City workers from Point Ruston have tested positive for arsenic." *Id*. In its letter, Regional Council wondered how Silver Cloud's "future guests would feel" about workers on the Point Ruston project complaining about being subjected to arsenic. *Id*.

After writing this letter, Regional Council picketed in front of a Seattle Silver Cloud hotel and handed out leaflets which made allegations similar to those discussed in Section (A) above regarding Rain City workers testing positive for arsenic. Included in these leaflets was the statement: "Shame on Silver Cloud Inns and Hotels for desecration of the American way of life." *Id*.

**C.     PLAINTIFFS' LAWSUIT**

On April 21, 2009, Plaintiffs filed a complaint. Dkt. 1. Plaintiffs' first cause of action is against Regional Council only, and alleges unlawful secondary boycott, in violation of 29 U.S.C. § 158(b)(4)(B) and (D) and 29 U.S.C. § 187. *Id*. at 23. Plaintiffs

ORDER - 4

allege that Regional Council engaged in threatening and intimidating conduct for the purpose of forcing Plaintiffs to cease doing business with Rain City. *Id*. Plaintiffs also allege that Regional Council engaged in conduct such as threatening and intimidating other entities to cause them to withhold services from Point Ruston and Silver Cloud, threatening and/or intimidating potential lenders, retail and commercial clients, and prospective home buyers. In addition, Plaintiffs allege that Regional Council failed to limit leafleting, picketing, and demonstrations to places reasonably close to the situs of the Regional Council's dispute with Rain City. Plaintiffs maintain that employees, agents, and representatives of the Regional Council encouraged, induced, participated in, acquiesced in, and ratified these "unlawful secondary activities." *Id*.

Section 8(b)(4)(B) of the LMRA prohibits secondary boycott activities. *Iron Workers Dist. Council of the Pac. Nw. v. N.L.R.B.*, 913 F.2d 1470, 1475 (9th Cir. 1990).[2] Secondary boycott activities are those "which are calculated to involve neutral employers and employees in the union's dispute with the primary employer." *Id*.

Plaintiffs also assert the following state law claims:

---

[2] Section 8(b)(4)(B) provides:

It shall be an unfair labor practice for a labor organization or its agents . . . (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is . . . forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; . . . .

29 U.S.C. § 158(b)(4)(B)

1.    Defamation. Plaintiffs allege that all Defendants made false statements about Point Ruston, Mr. Cohen, and Silver Cloud which adversely affected business operations and deterred others from dealing with Point Ruston and Silver Cloud. *Id*. at 28.

2.    Tortious Interference with Contract. Plaintiffs allege that all Defendants intentionally interfered with Point Ruston's agreement with Rain City and another contractor, Diamond Concrete, for the purpose of pressuring Point Ruston to terminate its arrangement with these contractors. Plaintiffs allege that Defendants' motive was to require Point Ruston to cease using Rain City as a contractor and instead transfer or reassign the work to another class or trade of employees. Plaintiffs further allege that Defendants interfered with agreements between Point Ruston and customers seeking to purchase condominiums, agreements between Silver Cloud and its potential customers, and agreements between Point Ruston and Silver Cloud.

3.    Tortious Interference with Business Expectancy. Plaintiffs allege that Defendants engaged in conduct which interfered with Point Ruston's business expectancies with Silver Cloud, potential customers, lenders, and potential retail clients.

4.    Trespass. Plaintiffs allege that all Defendants trespassed onto the Point Ruston project site and the Point Ruston ferry.

5.    Trespass to Chattels. Plaintiffs allege that all Defendants intentionally interfered with Point Ruston property by engaging in such conduct as placing signs and banners on fences.

6.    Conversion. Plaintiffs allege that unknown individuals converted property, including damaging padlocks and slashing tires.

Dkt. 1.

On May 26, 2009, JWJ filed a motion to dismiss. Dkt. 22.  JWJ moves the Court to dismiss Plaintiffs' claims for lack of subject-matter jurisdiction on grounds that there is no "common nucleus of operative fact" between the state claims against JWJ and the sole federal claim against Regional Council. *Id*. at 6.

On June 9, 2009, Plaintiffs filed a response. Dkt. 30. On June 19, 2009, JWJ filed a reply. Dkt. 34.

## II.  LEGAL STANDARDS

### A.  MOTION TO DISMISS UNDER RULE 12(b)(1)

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(1) if, considering the factual allegations in the light most favorable to the plaintiff, the action: (1) does not arise under the Constitution, laws, or treaties of the United States, or does not fall within one of the other enumerated categories of Article III, Section 2, of the Constitution; (2) is not a case or controversy within the meaning of the Constitution; or (3) is not one described by any jurisdictional statute. *Baker v. Carr*, 369 U.S. 186, 198 (1962); *D.G. Rung Indus., Inc. v. Tinnerman*, 626 F. Supp. 1062, 1063 (W.D. Wash. 1986); *see* 28 U.S.C. §§ 1331 (federal question jurisdiction) *and* 1346 (United States as a defendant).  When considering a motion to dismiss pursuant to Rule 12(b)(1), the court is not restricted to the face of the pleadings, but may review any evidence to resolve factual disputes concerning the existence of jurisdiction. *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988), cert. denied, 489 U.S. 1052 (1989); *Biotics Research Corp. v. Heckler*, 710 F.2d 1375, 1379 (9th Cir. 1983).

### B.  SUPPLEMENTAL JURISDICTION

The parties agree that this Court does not have jurisdiction over Plaintiff's state law claims unless it is authorized to exercise supplemental jurisdiction, and unless it determines that maintaining jurisdiction over the state claims is proper. The governing statute provides:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).

ORDER - 7

Section 1367 codified the rule set out in *United States v. Gibbs*, 383 U.S. 715 (1966): A federal court may exercise supplemental jurisdiction when a plaintiff has alleged state and federal claims that "derive from a common nucleus of operative fact." *Gibbs*, 383 U.S. at 725. Supplemental jurisdiction is proper when a plaintiff's state claims are "so intertwined with other matters pending before the court as to make the exercise of such jurisdiction over [the state claims] appropriate" and the state and federal claims are such that the plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *Republic of Phil. v. Marcos*, 862 F.2d 1355, 1359 (9th Cir. 1988).

If a court determines it has the authority to exercise supplemental jurisdiction, it then decides whether it should nonetheless decline to maintain jurisdiction. This is because supplemental jurisdiction is "a doctrine of jurisdiction, not of plaintiff's right." *See Gibbs* at 726. "Its justification lies in considerations of judicial economy, convenience and fairness to litigants." *Id*. Section 1367(c) provides:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--
> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

## III. DISCUSSION

### A. SECTION 1367(a) ANALYSIS

The parties agree that the Court has original jurisdiction over Plaintiffs' LMRA claim, but dispute whether Plaintiffs' state law claims against JWJ arise from a "common nucleus of operative fact."

The parties provided several cases which describe what is meant by a "common nucleus of operative fact." In *Chelsea Condo. Unit Owners Ass'n v. A. St. Condo. Group*, 468 F. Supp. 2d 136 (D.D.C. 2007), the district court stated that a common nucleus exists when there is "a link or overlap" between the facts of the state and federal claims.

ORDER - 8

*Chelsea*, 468 F. Supp. 2d at 141. Conversely, *Chelsea* stated that supplemental jurisdiction is not proper when there is almost no factual or legal overlap between the state and federal claims. *Id*. The court also looked to whether the facts needed to prove the federal claim would also be needed to prove the state claims. *Id*. at 142; *accord Salei v. Boardwalk Regency Corp.*, 913 F. Supp. 993, 999 (E.D. Mich. 1996) (facts relevant to resolution of federal claim must not be separate and distinct from those facts that bear on the state claims). In an unpublished opinion, a Ninth Circuit district court looked to whether the state and federal claims involve the same facts, occurrences, witnesses and evidence. *U.S. Chess Fed'n, Inc. v. Polgar*, 2009 WL 981257, *3 (N.D. Cal. 2009) (*citation omitted*). "Even a 'loose, factual connection between the claims is generally sufficient.'" *Id*. (*quoting Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995)); *but see Lyon v. Whisman*, 45 F.3d 758, 761-62 (3d Cir. 1995) (citing cases which have rejected the "loose nexus" test).

The Court concludes that, under any of the standards discussed above, Plaintiffs have demonstrated that the state claims asserted against JWJ and the federal claim asserted against Regional Council arise from a common nucleus of operative fact.

JWJ argues that the federal claim against Regional Council involves disparate facts because Plaintiffs must prove that Regional Council acted coercively, with intent to force the cessation of business activities, whereas the state claims against JWJ involve only a dispute concerning JWJ's expressive activities. As an example, JWJ argues that evidence offered to prove JWJ made unlawful, defamatory statements regarding Plaintiffs would bear no weight toward proving that Regional Council, "an unrelated labor organization participating in a labor dispute, violated the LMRA." Dkt. 22 at 17.

JWJ's arguments may have been more persuasive had Plaintiffs not alleged that Regional Council and JWJ often colluded in various activities designed to persuade neutral employers and individuals to cease dealing with Plaintiffs. JWJ contends that Plaintiffs' assertion that JWJ operated as an "agent" of Regional Council is merely

conclusory, and therefore should not be considered in the Court's Section 1367(a) analysis. *See* Dkt. 22 at 16 n. 1 (*citing Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009)). JWJ's argument that Plaintiffs failed to provide factual allegations in support of its statement that JWJ acted as an agent of Regional Council is not persuasive. For example, Plaintiffs allege that Regional Council distributed flyers prepared by JWJ, many of which referred to JWJ's website, where various statements now challenged by Plaintiffs were allegedly posted. In addition, Plaintiffs allege that JWJ members boarded the Point Ruston ferry and engaged in behavior such as handing out additional flyers and disrupting a presentation.[3] Plaintiffs allege that the ferry incident took place shortly after Regional Council representatives engaged in picketing and threatening behavior in an effort to interfere with Point Ruston's marketing activities. These and other allegations are specific, and are distinct from the conclusory, "bare assertions" discussed by the Supreme Court in *Iqbal*. Accordingly, for purposes of deciding the instant motion, the Court accepts the factual allegations as true.

The facts needed to prove Plaintiffs' LMRA claim will likely be the same or sufficiently similar to those needed to prove Plaintiffs' state law claims. JWJ's apparent suggestion that supplemental jurisdiction is lacking because the elements of the LMRA claim are not the same as the elements of the state law claims is not convincing. *See* Dkt. 34 at 4. While Plaintiffs may offer different evidence to prove the different elements of the federal claim and state claims, Plaintiffs have demonstrated that the core factual allegations form the basis of all the claims. For example, Plaintiffs may offer evidence of a flyer prepared by JWJ, and distributed by Regional Council and JWJ representatives, in an effort to prove the coercion element of the LMRA claim, as well as the falsity element

---

[3] JWJ also argues that it could not be an agent of Regional Council because Regional Council is not a member of JWJ, characterizing Regional Council as an "unrelated labor organization participating in a labor dispute." Dkt. 22, 16-17. JWJ claims that it is "absurd" to suggest that JWJ was motivated by a desire to pressure Plaintiffs to reassign work, Dkt. 34 at 4 n. 2, and that it "played no role" in the labor dispute at issue in this case. Dkt. 22 at 9. These are factual arguments that are not determinative of the instant motion.

of the defamation claim. In addition, Plaintiffs may offer evidence of the ferry incident to prove coercion, but also to prove the elements of trespass. Finally, evidence necessary to prove coercion may also apply to the business interference claims, trespass to chattels, and conversion claims.

Plaintiffs provide several examples of the operative facts that overlap between the federal claim and the state claims:

> [P]laintiffs' [LMRA] claim to recover damages for illegal secondary boycott activities and threats to force and coerce assignment of particular work are based upon various actions of defendants, including facts that form the basis of the claims of defamation, interference, trespass, and conversion. Similarly, the claim for defamation is based upon defamatory remarks which are intertwined with the defendant Regional Council's effort to persuade neutral employers to cease dealing with plaintiffs. Often the defamatory remarks were published in handouts or banners. The JWJ defendants frequently engaged in these activities in the presence of or in cooperation with the Regional Council.
> Also, the state claims for interference with contract and interference with business expectancy allege that the defendants have interfered with agreements between Point Ruston and Rain City (and Diamond Concrete). This is the same subject matter as Counts One and Two of the [LMRA] claim alleging that the Regional Council has engaged in unlawful activities in order to persuade a reassignment of work from Rain City (and/or Diamond Concrete) to others. The interference claims also allege interference between plaintiffs and their respective customers and vendors. Again, these allegations are similar to the secondary boycott allegations contained in Count One of the [LMRA] claim. Finally, the trespass claims and conversion claims assert that defendants have engaged in unlawful activities in violation of state laws. At the same time that the defendants were engaged in these activities, the Regional Council, by way of picketing and demonstrating, was also engaged in acts in violation of [the LMRA].

Dkt. 30, 11-12.

## B.    SECTION 1367(c) ANALYSIS

Defendants maintain that even if supplemental jurisdiction is authorized, the Court should decline to exercise jurisdiction because (1) state law claims substantially predominate over the sole federal claim, (2) at least one of Plaintiffs' state law claims raises novel or complex issues of state law, and (3) there are exceptional circumstances which provide compelling reasons for declining jurisdiction.

## 1. Whether State Claims Substantially Predominate Over LMRA Claim

If state claims substantially predominate, "whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought," over a plaintiff's federal claim, a court may decline to exercise supplemental jurisdiction. *See Gibbs*, 383 U.S. at 726-27; *see also* 28 U.S.C. 1367(c)(2).

JWJ first maintains that the Court should decline to exercise supplemental jurisdiction because the number of state claims "drastically" outweighs the sole federal claim in this case. While the Court may consider the number of state claims compared to the number of federal claims, this factor alone is not determinative. *See Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 789 (3d Cir. 1995).

JWJ next maintains that the evidence required to prove each of Plaintiffs' state claims vastly exceeds the proof required to prove the LMRA claim. JWJ further maintains that trying the state and federal claims will also cause jury confusion by requiring the jury to sort out the evidence presented as it pertains to the various elements of Plaintiffs' claims. Finally, JWJ contends that the remedy Plaintiffs seek for their state claims substantially predominates over the remedy sought for the federal claim. Plaintiffs counter that the state law issues presented in this case are straight forward and are not "more important, more time consuming, [or] more time consuming to resolve," than the LMRA claim. Dkt. 30 at 15.

The Court concludes that it should not decline to exercise supplemental jurisdiction over Plaintiffs' state law claims against JWJ because they do not "substantially predominate" over the LMRA claim. The Court agrees with Plaintiffs that the state law claims are not particularly complex. In addition, while proving the state law claims may involve the introduction of additional evidence not necessary to prove the LMRA claim, the Court, at this time, concludes that the core facts underlying the LMRA claim could conceivably also be introduced in an effort to prove the state claims. This does not appear to be a case where the state claims provide the "real body of [the] case, to

ORDER - 12

which the federal claim is only an appendage." *See Borough*, 45 F.3d at 789 (*citing Gibbs*, 383 U.S. at 727).

### 2. Whether Any of Plaintiffs' Claims Involve "Novel or Complex" Issues

A district court may decline to exercise supplemental jurisdiction if the claim raises a novel or complex issue of state law. 28 U.S.C. § 1367(c)(1).

JWJ maintains that Plaintiffs' defamation claims alleging harm to private figures caused by communications on matters of "unquestionable public concern" involve novel or complex issues of state law as to two issues: (1) whether a private defamation plaintiff facing a motion for summary judgment must make a prima facie case showing the elements of defamation with "convincing clarity" or only a preponderance of the evidence, and (2) the proper standard of fault to apply in a defamation case where a private figure is allegedly harmed by a communication addressing a matter of public concern. Dkt. 22 at 21. Plaintiffs counter that the issues identified by JWJ are not necessarily "unsettled," and argue that Plaintiffs' defamation claims were personalized attacks and did not involve public concern.

The Court concludes that it would be premature at this stage of the litigation to address JWJ's concerns regarding Plaintiffs' defamation claim. *See Gibbs*, 383 U.S. at 1139 (the issue of whether supplemental jurisdiction has been properly assumed is one which remains open throughout the litigation).

### 3. Whether "Exceptional Circumstances" Warrant Dismissal

JWJ has not shown that exceptional circumstances warrant dismissal. *See Executive Software N. Am. v. U.S. Dist. Court for Cent. Dist. of Cal.*, 24 F.3d 1545, 1558 (9th Cir. 1994) (a district court should not decline jurisdiction under Section 1367(c)(4) absent "quite unusual" circumstances).

ORDER - 13

**IV. ORDER**

Therefore, it is hereby **ORDERED** that

Defendants' motion to dismiss (Dkt. 22) is **DENIED**.

DATED this 27th day of July, 2009.

 

 

 

 

 

 

BENJAMIN H. SETTLE
United States District Judge