# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT TACOMA

POINT RUSTON, LLC; MICHAEL A. COHEN; and SILVER CLOUD, INC.,

Plaintiffs,

v.

PACIFIC NORTHWEST REGIONAL COUNCIL OF THE UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA; JOBS WITH JUSTICE EDUCATION FUND OF WASHINGTON STATE, a non-profit corporation; JIMMY MATTA, individually and as a representative of the Regional Council; JIMMY HAUN, individually and as a representative of the Regional Council; JACOB CARTON, individually and as a representative of Jobs with Justice; ADAM M. HOYT, individually and as a representative of Jobs with Justice; and DOES 1-50,

Defendants.

CASE NO. C09-5232BHS

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT REGIONAL COUNCIL'S MOTIONS FOR JUDGMENT ON THE PLEADINGS

This matter comes before the Court on the motions for judgment on the pleadings filed by Defendants Pacific Northwest Regional Council of Carpenters, Jimmy Matta, and Jimmy Haun (collectively "Regional Council"). Dkts. 26 and 36. The Court has considered the pleadings filed in support of and in opposition to the motions, and the remainder of the file, and grants in part and denies in part the motions for the reasons stated herein.

ORDER - 1

# I. FACTUAL BACKGROUND

Unless otherwise indicated, the Court presents the facts as alleged by Plaintiffs, the non-moving party.

Point Ruston, LLC, is a general construction contractor and property developer formed to provide management, development, and oversight services for the Point Ruston project. The Point Ruston project is a master planned mixed-use development constructed on a 97-acre site on the shores of Puget Sound, Washington. Plaintiff Silver Cloud, Inc., has an option to construct a hotel at Point Ruston.

From 1890 to 1986 the 97-acre parcel contained a facility that functioned as a lead and copper smelter. Asarco was the owner of the facility for the vast majority of those years, with the site producing almost 10% of the nation's copper. In 1981, the Environmental Protection Agency ("EPA") included the Asarco property on their interim priority list. Two years later, the EPA officially designated the land as a suprefund site on the National Priorities List. According to the EPA, the parcel contains certain levels of arsenic and lead. *See* Dkt. 43 at 6 (Declaration of Loren Cohen).

In 2006, Point Ruston purchased the property from Asarco during a bankruptcy proceeding, and assumed Asarco's environmental remediation liabilities for the property and other adjacent sites.

## A. POINT RUSTON'S ALLEGATIONS

In the spring of 2008, Point Ruston entered into an agreement with Rain City Contractors, Inc. ("Rain City") to provide construction of concrete foundations and other concrete structures. While all other contractors retained by Point Ruston in 2008 were union contractors, Rain City was not a unionized employer. After Point Ruston contracted with Rain City, Regional Council, a labor organization, informed Point Ruston that it had a labor dispute with Rain City, "and that if Point Ruston continued to use Rain City on the project then the Regional Council would have a dispute with Point Ruston as well." Dkt. 1 at 7 (Plaintiffs' complaint). On June 2, 2008, Regional Council representatives met with

Point Ruston and Rain City representatives. *Id*. During this meeting, Defendant Jimmy Matta of Regional Council informed Rain City that it would benefit from entering into a collective bargaining agreement with Regional Council. *Id*. at 8. Mr. Matta stated that Rain City would benefit from such an arrangement in part because Mr. Matta would "stop harassing [Rain City], leave you alone, and not spank you," and went on to describe how he had previously "spanked" a different contractor because they were non-union. *Id*.

At some point, Plaintiffs allege that "[i]n order to persuade Rain City to sign a contract with the Carpenters Union and/or induce Point Ruston to use a contractor which employs Carpenter Union members[,] Matta . . . stated that he would arrange to have the Regional Council throw a 'shit load' of 'Marketing Recovery Fund' dollars at the job." *Id*. Plaintiffs claim that they are "informed and believe . . . that Marketing Recovery Funds are funds which the Regional Council disburses from a fund directly to contractors employing members of the Carpenters Union in order to subsidize those contractors so that they can pay wages and benefits consistent with the Carpenters Union contracts for Carpenters performing concrete work." *Id*.

When Point Ruston refused to break its contract with Rain City, demonstrators, which included members of Regional Council, began appearing at Point Ruston's construction site and sales center and handed out flyers and leaflets prepared by Regional Council and Defendant Jobs with Justice Education Fund of Washington State ("JWJ").[1] *Id*. at 9. On other occasions, the demonstrators brought large signs, banners, or other objects. *Id*. Plaintiffs maintain that the demonstrators made "intimidating, untruthful, and offensive comments to persons regarding Point Ruston." *Id*. The demonstrators often "moved about as a group so as to create an appearance of intimidation." *Id*.

---

[1] According to its website, JWJ is "a 14 year old coalition of over 154 member organizations and 5000 'I'll be there' individual pledgers fighting together for workers' rights and economic & social justice." Dkt. 22 at 15 (citation to website address omitted). Plaintiffs do not allege that JWJ is a labor organization.

Plaintiffs maintain that they are "informed and believe . . . that Regional Council has coordinated with and used JWJ to engage in unlawful demonstration activities on behalf of the Regional Council." *Id*. at 22.[2] Many of the leaflets distributed during demonstrations referred to the JWJ website; this website included a statement that Michael Cohen, a Point Ruston managing member, was "spreading Asarco dust in the surrounding community . . . . Mr. Cohen's track record is evasive, anti-worker and community, corrupting our democracy, and doused with grinchy behavior." *Id*. at 9. According to Plaintiffs, JWJ also posted the following statement on its website, referring to a YouTube video: "Together, these videos demonstrate a disturbing health threat to condo buyers, neighbors, workers, P[oint] Ruston visitors and anybody in our community who makes contact with these people." *Id*. at 10. Plaintiffs also maintain that JWJ posted a separate message on its website, alleging that immigrant workers reported that Point Ruston engaged in "severe union-busting tactics" including threats of violence, mass firings, and other activities. *Id*. at 11. In addition, JWJ issued a statement in April 2009 that (1) the Point Ruston site had arsenic concentrations between 10 and 150 times the state allowable limits; (2) a former Point Ruston worker died from a respiratory infection, and that the worker had suffered symptoms "similar to those suffered by other Point Ruston workers"; and (3) "scores of Point Ruston workers were exposed to poisons without proper training, equipment, or monitoring." *Id*. at 21.

Point Ruston also alleges that "employees, representatives or agents" of Regional Council handed out leaflets at various events which included the following statements:

- "[W]hatever you do, don't go to Point Ruston. It will kill you." *Id*. at 9.
- "It's a view to die for – buyers beware." *Id*.

---

[2] Plaintiffs also state that they are "informed and believe . . . [that] Regional Council has funded some of the illegal activities" described throughout the complaint by providing leaflets and signage for persons demonstrating against Point Ruston and Silver Cloud and compensating employees who have engaged in picketing, leafletting, and demonstrating on behalf of Regional Council and/or JWJ. *Id*., 22-23.

ORDER - 4

- "SHAME ON Mike Cohen & Rain City for spreading poison! . . . Two years ago, Mike Cohen agreed to clean-up the contamination left by Asarco. Now workers on his site employed by Rain City . . . are being exposed to poisons. Now Asarco dust and dirt are being released into the community." *Id*. at 10.

- Point Ruston has "expose[d] . . . workers and nearby residents to toxic poisons . . . [has taken] taxpayer funds to build a luxury village . . . [and has] corrupt[ed] our democracy through . . . pay-offs, union-busters, and threats of raids . . . ." *Id*. at 11.[3]

On February 27, 2009, Mr. Matta "stated that he knew of a death that occurred at Point Ruston" and that one or more workers had "lost their feet." *Id*. at 15. It is not clear to whom Mr. Matta allegedly made this statement. The complaint also alleges that Regional Council representatives made statements that an individual had died at the Point Ruston site during an event Point Ruston had arranged for outside realtors. *Id*. at 21.

Point Ruston claims that while an individual who previously worked for Point Ruston died, the individual did not die at Point Ruston and the cause of death was unrelated to any work conducted on the Point Ruston site.

## B. SILVER CLOUD'S ALLEGATIONS

On February 4, 2009, a Regional Council representative wrote a letter to Silver Cloud, informing the company that Regional Council had a labor dispute with Rain City, and that if Silver Cloud used Rain City on its project on the Point Ruston site, Regional Council would also have a dispute with Silver Cloud. *Id*. at 13. Regional Council further informed Silver Cloud that "several Rain City workers from Point Ruston have tested positive for arsenic." *Id*. In its letter, Regional Council wondered how Silver Cloud's "future guests would feel" about workers on the Point Ruston project complaining about being subjected to arsenic. *Id*.

---

[3] Defendants allegedly included this statement on a placard, and placed an inflatable rat near Mr. Cohen's home and stated that Mr. Cohen had won the "Grinch of the Year" contest. Defendants are alleged to have distributed flyers throughout Mr. Cohen's residential neighborhood after placing this rat near his home. It is not clear whether the placard statement quoted here was included in the flyers distributed to neighbors.

ORDER - 5

After writing this letter, Regional Council "picketed"[4] in front of a Seattle Silver Cloud hotel and handed out leaflets which made allegations similar to those discussed in Section (A) above regarding Rain City workers testing positive for arsenic. Included in one of these leaflets was the statement:

> SHAME ON Silver Cloud Inns and Hotels for desecration of the American way of life.
> * * *
> A rat is a contractor that does not pay all of its employees the Area Standard Wages, including either providing or making payments for family health care and pension benefits. Businesses that choose this breed of contractor are guilty as well.
> * * *
> [Regional Council] has a labor dispute with Rain City . . . which is a subcontractor for Point Ruston . . . .
> * * *
> However, this all pales in comparison to the fact that several Rain City . . . workers from Point Ruston have tested positive for aresenic. If workers are complaining about being subjected to arsenic, is Point Ruston a safe place to build a hotel?

*Id.*, 13-14.

On February 11, 2009, demonstrators posted a banner at a Seattle Silver Cloud hotel which stated "Labor Dispute - Point Ruston Silver Cloud Hotel - Got Arsenic?" *Id.*

### C. WASHINGTON DEPARTMENT OF LABOR & INDUSTRIES INVESTIGATION

In July 2008, the Washington State Department of Labor & Industries commenced an investigation of Point Ruston and Rain City. *Id.* at 11. On January 16, 2009, Labor & Industries issued its findings, and found that Rain City had not ensured that its workers received 24-hour training before participating in hazardous waste operations, and that Rain City did not ensure its supervisors and managers received required training. Labor & Industries issued a citation to Rain City; however, the Department found that the site did not reflect a dangerous or unsafe workplace. Labor & Industries also did not substantiate any findings of instances of workers getting sick because of exposure to materials on site.

---

[4] Plaintiffs did not describe the Defendants' specific actions which amounted to "picketing."

ORDER - 6

Labor & Industries also responded to an inquiry by Mr. Matta, and stated that proper personal equipment was observed being used when needed, and no problems were identified with the safety supplies and procedures being used. The response also stated that "[i]t could not be documented that workers were getting sick because of exposure to materials on the Point Ruston site." *Id*. at 12.[5]

## II. PROCEDURAL BACKGROUND

On April 21, 2009, Plaintiffs filed a complaint. Dkt. 1. Plaintiffs' first cause of action alleges unlawful secondary boycott, in violation of Section 303 of the Labor Management Relations Act, 29 U.S.C. § 158(b)(4)(B) and (D) and 29 U.S.C. § 187. *Id*. at 23.[6]

Plaintiffs further allege three state law claims which are challenged by Regional Council: claims for defamation, tortious interference with contract, and tortious interference with business expectancy. Plaintiffs also allege additional state law claims which Regional Council did not challenge.

On June 5, 2009, Regional Council filed a motion for judgment on the pleadings, seeking to dismiss Silver Cloud's claims for (1) violation of Section 303, (2) defamation, (3) tortious interference with contract, and (4) tortious interference with business expectancy. Dkt. 26. On July 10, 2009, Point Ruston filed a response. Dkt. 40. On July 17, 2009, Regional Council filed a reply. Dkt. 45.

On June 24, 2009, Regional Council filed a motion for judgment on the pleadings, seeking to dismiss Point Ruston's claims for (1) defamation, (2) tortious interference with contract, and (3) tortious interference with business expectancy. Dkt. 36. Regional

---

[5] In support of its motion to dismiss Plaintiffs' defamation claims, Regional Council moves the Court to take judicial notice of documents regarding the Labor & Industries investigation, as well as other evidentiary items. *See* Dkts. 28 and 38. Because the Court denies Plaintiffs' motion as to the defamation claims without regard to the Labor & Industries documents or other items, judicial notice of this evidence is not necessary.

[6] While "Section 303" refers to Section 187 of the LMRA, the Court will refer to Plaintiffs' federal claims as "Section 303 claims."

ORDER - 7

Council also moves to dismiss Plaintiffs' state law claims to the extent they are based on JWJ's alleged conduct. *See* Dkt. 46 at 12. On July 10, 2009, Point Ruston filed a response. Dkt. 39. On July 17, 2009, Regional Council filed a reply. Dkt. 46.

### III. DISCUSSION

**A.     RULE 12(c) STANDARD**

"After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1990). The standard applied on a Rule 12(c) motion is essentially the same as that applied on a Rule 12(b)(6) motion for failure to state a claim: "the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false." *Id*. However, the Court is not required to accept as true mere legal conclusions unsupported by alleged facts. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-1952 (2009). To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. at 1949 (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

When considering a motion for judgment on the pleadings, a court may consider material which is properly submitted as part of the complaint without converting the motion into a motion for summary judgment. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Where the documents are not physically attached to the complaint, they may be considered if the documents' "authenticity . . . is not contested" and "the plaintiff's complaint necessarily relies" on them. *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994) (quoting *Parrino v. FHP, Inc.,* 146 F.3d 699, 705-06 (9th Cir.

ORDER - 8

1998)). Further, pursuant to Fed. R. Evid. 201, a court may take judicial notice of "matters of public record" without converting a motion to dismiss into a motion for summary judgment. *Mack v. South Bay Beer Distrib., Inc.,* 798 F.2d 1279, 1282 (9th Cir. 1986). A court may not, however, take judicial notice of a fact that is subject to reasonable dispute. Fed. R. Evid. 201(b). In addition, Federal Rule of Civil Procedure 12(d) provides that "[a]ll parties must be given a reasonable opportunity to present all the materal that is pertinent" to a motion for judgment on the pleadings.

**B.    PLAINTIFFS' PROCEDURAL CHALLENGES TO REGIONAL COUNCIL'S MOTIONS AND REQUEST FOR JUDICIAL NOTICE**

Plaintiffs first argue that Regional Council's motions are overlength because a motion for judgement on the pleadings is limited to 12 pages, rather than 24 pages. Dkt. 40 at 8 (citing Local Rule CR 7(d)(3)). Although a motion for judgment on the pleadings is not specifically identified in CR 7(d)(3), the motion should be considered equivalent to a motion to dismiss for purposes of determining the proper page limit. Therefore, Regional Council's motions do not exceed the page limit. In addition, as pointed out by Regional Council, it appears that while Plaintiffs limited their responses to 12 pages, they appear to have exceeded any 12-page limit by providing additional factual argument in their attorneys' declarations attached to their responses. As a result, Plaintiffs have not been prejudiced by restricting themselves to 12 pages. Finally, the Court has permitted Plaintiff further briefing.

Plaintiffs next argue that Regional Council filed the motions prematurely because pleadings were not closed at the time of filing. While Plaintiffs are correct that Regional Council filed the motions prior to the close of pleadings, Defendant Jobs with Justice has now answered, and the pleadings are closed. Dkt. 59. On August 17, 2009, the Court issued a minute order, allowing Plaintiffs to supplement their response. Dkt. 65.

On August 26, 2009, Plaintiffs provided additional briefing. Dkts. 67 (Point Ruston) and 68 (Silver Cloud). On August 31, 2009, Regional Council filed replies. Dkts. 70 (Silver Cloud) and 71 (Point Ruston). Also on August 31, 2009, Regional Council

ORDER - 9

filed a Request for Judicial Notice (Dkt. 72). The Court then issued an Order to Show Cause why it should not take judicial notice (Dkt. 73). Having received no objections, the Court took judicial notice of the requested documents.

## C.     PLAINTIFFS' CONTRACT-BASED CLAIMS[7]

Plaintiffs' third claim for relief is for tortious interference with a contract. Dkt. 1, 29-34. In Count I of this claim, Plaintiffs allege that Point Ruston and Rain City entered into an agreement in which Rain City was to perform concrete work at the Point Ruston Project, and later entered into an agreement with Diamond Concrete, and that Regional Council knew of these agreements. *Id*. at 29. Plaintiffs further allege that Regional Council interfered with these agreements by perpetrating the following acts: (1) engaging in secondary boycott activities; (2) engaging in threats "in support of a jurisdictional dispute"; (3) willfully and intentionally publishing and disseminating false, misleading, disparaging, and damaging statements about Plaintiffs; (4) trespassing on Point Ruston's property; and (5) defaming Point Ruston and Mr. Cohen. *Id*. at 30. Plaintiffs allege that Regional Council committed these acts for the purpose of pressuring Point Ruston to terminate its agreement with Rain City and Diamond Concrete, and to force Point Ruston to transfer or reassign the work to another contractor and/or class or trade of employees. *Id*.

Plaintiffs make similar allegations in Counts II-IV of their third claim: In Count II, Plaintiffs allege that Regional Council interfered with contractual agreements between Point Ruston and customers in the market for residences; in Count III, Plaintiffs allege that Regional Council interfered with agreements between Silver Cloud and its customers for the rental of hotel rooms; and in Count IV, Plaintiffs allege interference with agreements between Point Ruston and Silver Cloud. *Id*., 31-34.

---

[7] The Court refers to Plaintiffs' tortious interference with a contract and tortious interference with business expectancy claims as "contract-based claims."

Plaintiffs' fourth claim for relief alleges interference with business expectancy. *Id.*, 34-41. This claim nearly mirrors Plaintiffs' third claim, but alleges some different business relationships with which Regional Council has interfered. *Id.*

Regional Council maintains that Point Ruston's and Silver Cloud's state contract claims for tortious interference with contract and tortious interference with business expectancy are preempted by Section 303. In support, Regional Council cites several decisions, including *San Antonio Community Hospital v. Southern California Dist. Council of Carpenters*, 125 F.3d 1230 (9th Cir. 1997), and *Smart v. Local 702 IBEW*, 562 F.3d 798 (7th Cir. 2009).

The Court begins by summarizing the relevant federal and state statutes, and then addresses the case law concerning the issue of preemption under Section 303.

**1.  Section 303 and Interference with Contractual Relations or Business Expectancy**

Section 303 of the LMRA prohibits secondary boycott activities. 29 U.S.C. § 158(b)(4)(B); 29 U.S.C. § 187 ("it shall be unlawful . . . for any labor organization . . . to engage in activity . . . [as defined in] section 158(b)(4)"). Secondary boycott activities are those "which are calculated to involve neutral employers and employees in the union's dispute with the primary employer." *Iron Workers Dist. Council of the Pac. Nw. v. N.L.R.B.*, 913 F.2d 1470, 1475 (9th Cir. 1990). Specifically, Section 158 prohibits an attempt by a labor organization to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is to force or require any person to cease doing business with any other person, or for the purpose of forcing or requiring another person to assign work to employees in a particular labor organization. 29 U.S.C. 158(b)(4)(ii)(B) and (D).

To prove tortious interference with contractual relations or business expectancy,

> the plaintiff must produce evidence sufficient to support all the following findings: (1) the existence of a valid contractual relationship or business expectancy; (2) the defendant's knowledge of and intentional interference with that relationship or expectancy; (3) a breach or termination of that relationship or expectancy induced or caused by the interference; (4) an

> improper purpose or the use of improper means by the defendant that caused the interference; and (5) resultant damage.

*Eugster v. City of Spokane*, 121 Wn. App. 799, 811 (2004).

### 2. Section 303 Preemption

Regional Council maintains that *San Antonio* stands for the proposition that Section 303 completely preempts Plaintiffs' contract-based claims.

In *San Antonio*, a hospital sought a preliminary injunction against a union, to prohibit the union from displaying a banner reading "THIS MEDICAL FACILITY IS FULL OF RATS." *San Antonio*, 125 F.3d at 1233. The union was engaged in a labor dispute with a hospital construction subcontractor, but not with the hospital itself. *Id*. The hospital had filed a complaint alleging unlawful secondary boycott activities under Section 303, as well as additional state tort and contract-based claims. *Id*. The district court granted the injunction.

On appeal, the Ninth Circuit upheld the injunction, after finding that the hospital's defamation claims formed the "only possible basis for the preliminary injunction." *Id*. at 1235. The Court held that the hospital's state law claims for interference with prospective economic advantage and contractual rights claims were preempted by Section 303, stating that such claims "cannot form the basis of injunctive relief" because only damages were available under Section 303. *Id*.

Plaintiffs seek to distinguish *San Antonio*, and maintain that there is no authority supporting Regional Council's position that Section 303 completely preempts their contract-based claims. Plaintiffs claim that *San Antonio* is inapposite because the issue before the Ninth Circuit was whether the remedy sought by the hospital conflicted with its Section 303 claim. Dkt. 39 at (7) (citing *Sutter Health v. UNITE HERE*, 2005 WL 1925910, at *5 (E.D. Cal. 2005) (unpublished opinion). Therefore, Plaintiffs maintain, "there is no authority that there is complete preemption between Section 303 claims and interference with contract claims." *Id*. Plaintiffs suggest that the *San Antonio* court applied the doctrine of conflict preemption, rather than complete preemption.

ORDER - 12

In addition, Plaintiffs argue that Section 303 does not preempt their contract-based claims because the claims are based on allegations of conduct that "falls outside the protection of federal labor law" rather than the type of conduct protected by federal labor law, as was the case in *Morton*, *infra* n. 8. Dkt. 68 at 3. Finally, Silver Cloud argues that Section 303 cannot preempt its contract-based claims because it has no existing relationship or contact with Rain City. *Id.*

Conflict preemption is the doctrine whereby state law is preempted to the extent it conflicts with federal law, regulations or the Constitution. *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 31 (1996). Complete preemption is a term that describes "the specific situation in which a federal law not only preempts a state law to some degree but also substitutes a federal cause of action for the state cause of action." *Smart*, 562 F.3d at 803 (citation omitted). A state claim may be completely preempted when Congress clearly intended to completely "replace a state law with federal law and create a federal forum." *Id.* at 804 (citation omitted).

The *San Antonio* decision appears to have been based on conflict preemption; it is not clear that this decision stands for the proposition that contract-based claims are completely preempted by Section 303. The Ninth Circuit's holding that the plaintiff's contract-based claims were preempted was based on its conclusion that injunctive relief available under the pertinent state laws was not available under Section 303. *San Antonio* addressed the issue of whether the plaintiff was likely to succeed on the merits of its claim for injunctive relief; the issue of complete preemption was not before the Court.[8]

---

[8] The Court recognizes that the broad language used in *San Antonio* may suggest that the Ninth Circuit held that the contract-based claims were completely preempted, and not that the claims were preempted *solely* based on the fact that Section 303 does not permit injunctive relief: "The interference with prospective economic advantage and contractual rights claims are preempted by section 303 of the LMRA. *Local 20, Teamsters v. Morton*, 377 U.S. 252, 260-61 (1964). *And* an employer cannot seek injunctive relief from a secondary boycott under section 303; only damages are available." *San Antonio*, 125 F.3d at 1235 (emphasis added). This Court nonetheless concludes that the *San Antonio* holding was limited to the issue before the Ninth Circuit: whether the plaintiff was likely to succeed on the merits based on its claim for injunctive relief. It also appears to this Court that *Morton* (cited in *San Antonio*) addressed issues of conflict

ORDER - 13

This Court nonetheless concludes that Plaintiffs' contract-based state claims against Regional Council must be dismissed because they are preempted by Section 303. In reaching this conclusion, the Court adopts the reasoning set out in *Smart*, 562 F.3d at 803-808. In *Smart*, the Seventh Circuit held that Section 303 completely preempts state-law claims related to secondary boycott activities described in Section 158(b)(4). *Id.* at 808. The Seventh Circuit found that "Congress has provided an explicit means of redressing alleged violations of section 158(b)(4) through section 187 of Title 29." *Id.* The *Smart* court concluded that the plaintiff had pleaded a federal claim under the LMRA, despite his choice to instead articulate his claim under the Illinois Antitrust Act. *Id.*

In this case, Plaintiffs' contract-based claims are completely preempted by Section 303. Similar to the plaintiff's state antitrust claim in *Smart*, Plaintiffs' contract-based claims in this case seek damages for conduct already prohibited by Section 158(b)(4). *See Smart*, 562 F.3d at 807 (Congress has provided a means of redress in federal court for injuries resulting from a secondary boycott).[9] Indeed, as Regional Council points out, Plaintiffs specifically cite secondary boycott activities as a basis for their contract-based claims. Plaintiffs' contract-based claims allege that Regional Council engaged in activity designed to interfere with Plaintiffs' contracts and business expectancies, and allege that Regional Council did so to pressure Point Ruston, Silver Cloud, and others to terminate or otherwise interfere with business relations. Labor organizations and their agents are

---

preemption, and not complete preemption. *Morton*, 377 U.S. at 260-61 (holding that state law has been displaced by Section 303 in private damages actions *based on peaceful union secondary activities*, after concluding (1) a state law proscribing activities not proscribed by Section 303 was preempted, and (2) a state law allowing punitive damages was preempted because Section 303 allowed only actual, compensatory damages).

[9] In contrast, the Court cannot infer Congressional intent to preempt state statutes that address issues that are "only collateral or peripheral" to Section 158(b)(4). *See Smart*, 562 F.3d at 805 n. 5. For example, as Regional Council appears to acknowledge, Plaintiffs' state law claim for defamation is not preempted by Section 303.

ORDER - 14

specifically prohibited from engaging in such activity by Section 158(b)(4). Therefore, these claims are preempted and must be dismissed.[10]

**D.   SILVER CLOUD'S SECTION 303 CLAIM**

Silver Cloud maintains that Regional Council violated Section 303 by "threatening and intimidating Silver Cloud for the purpose of causing Silver Cloud to cease doing business with Rain City (and Diamond Concrete LLC)." Dkt. 1 at 23. Silver Cloud further alleges that Regional Council (1) threatened and intimidated neutral entities to discourage them from dealing with Silver Cloud, and (2) picketed Silver Cloud at locations that are geographically separate from the location where Rain City is performing its work. *Id*. at 24.

Regional Council contends that Silver Cloud's Section 303 claim must be dismissed because Silver Cloud did not specify facts that support its claim. Dkt. 26, 13-14. Regional Council maintains that although picketing may trigger Section 303 liability, Silver Cloud's allegation of picketing is conclusory, and not supported by alleged facts. *Id*. With respect to allegations of bannering and handbilling, Regional Council argues that Silver Cloud's claim fails as a matter of law because such activity is permitted under federal labor laws. *Id*. (citing, e.g., *Overstreet v. Carpenters Local Union No. 1506*, 409 F.3d 1199 (9th Cir. 2005)).

In response, Silver Cloud maintains that its allegation of picketing is sufficient because "a more in-depth description of picketing is not required" under notice-pleading standards. Silver Cloud further argues that *Overstreet* is inapposite because *Overstreet*

---

[10] Plaintiffs argue that the claims are not preempted because the claims are not based on conduct protected by federal labor law. However, as discussed by the court in *Smart*, state claims can be preempted not only when state law prohibits conduct protected under federal labor law, but also when such conduct is prohibited under federal labor law. *Smart*, 562 F.3d at 805 (*referring to San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959)). Plaintiffs also suggest that Silver Cloud's Section 303 claims should not be preempted because "it has no existing relationship or contract with Rain City." Silver Cloud's Section 303 claims are preempted; Section 303 prohibits secondary activities, regardless of whether such a relationship between Silver Cloud and Rain City existed.

ORDER - 15

addressed a petition seeking injunctive relief, whereas Silver Cloud has pled an action for damages.

While Silver Cloud's Section 303 claim comes close to providing merely a recitation of the elements, *see Iqbal, supra*, the Court concludes that Silver Cloud has pled a cognizable Section 303 claim because it has alleged a set of facts which give rise to a plausible claim. The Court has considered Silver Cloud's allegations concerning the letter Regional Council sent to Silver Cloud discussing its labor dispute with Rain City, as well as allegations of picketing and bannering at two Silver Cloud hotels. Moreover, the Court has also considered Silver Cloud's allegations as they relate to the totality of Plaintiffs' allegations made throughout the complaint. At this stage of the litigation, Silver Cloud's Section 303 claim should proceed.

As the Ninth Circuit observed in *Overstreet*, the text of Section 303 is vague, and courts have struggled with differentiating between expressive conduct that is protected by the First Amendment and coercive or threatening conduct which violates Section 303. *See Overstreet*, 409 F.3d at 1212. The Court has reviewed the cases cited by the parties, and concludes that, in this case, differentiating from prohibited and permissive conduct requires further factual development of the record.

The Court notes that, as Silver Cloud points out, the *Overstreet* Court reviewed a claim for preliminary injunctive relief. *Overstreet*, 409 F.3d at 1209 (stating that its decision was limited to the "narrow inquiry" as to whether granting the plaintiff's request for an injunction presents a significant risk to the First Amendment); *see also id.* at 1211 (stating that it was "sufficient" for purposes of reviewing a request for injunctive relief that the union's First Amendment argument was plausible and "quite possibly [would be] meritorious"). In reviewing a claim for injunctive relief, *Overstreet* decided that Section 303 *generally* does not prohibit "bannering." *Overstreet*, 409 F.3d at 1213. Significantly, the *Overstreet* court reviewed the facts of the case, and determined that the union had not engaged in intimidating conduct. *See id.*, 1202-1204 and 1213. In this case, it appears that

the viability of this claim will depend on the specific factual context of Regional Council's alleged conduct.

If, after further development of the record, Regional Council can demonstrate that the facts of this case do not support Silver Cloud's Section 303 claim, it may move for summary judgment.

**E.   DEFAMATION**

Plaintiffs' defamation claims are based on Regional Council's alleged statements that Point Ruston workers are being exposed to poisons and have tested positive for arsenic, "Asarco dust" is being released into the community, a Point Ruston worker has died, implying that the death was due to conditions at Point Ruston, and other allegedly defamatory statements. Dkt. 1, 26-29; Section I, *supra*

Regional Council moves to dismiss the defamation claims on grounds that the statements are either true, or are non-actionable because they constitute rhetorical questions or mere opinion. In support of its motion, Regional Council urges the Court to take judicial notice of various evidentiary items.

The parties apparently agree that the proper defamation standard is set out in *Steam Press Holdings v. Hawaii Teamsters, Local 996*, 302 F.3d 998, 1004 (9th Cir. 2002). Under *Steam Press*, a plaintiff must prove "(1) that the allegedly defamatory statement asserts a fact or 'implies an assertion of objective fact'; (2) that the factual assertion is false; and (3) that the speaker published the challenged statement with 'actual malice.'" *Id*. at 1004.

The Court concludes that Plaintiffs' defamation claims survive Regional Council's motion for judgment on the pleadings. Without addressing each individual alleged defamatory statement challenged by Regional Council, the Court identifies one statement which gives rise to a plausible defamation claim: Regional Council's alleged statement concerning the release of "Asarco dust" into the community.

Regional Council contends that the statement that Point Ruston was releasing "Asarco dust" (presumably implying dust containing toxins or poisons) into the

community is not actionable because the statement is true. Plaintiffs counter that this statement is false, and that this and other statements were published with actual malice. The Court finds that, at least with regard to this statement, a cognizable defamation claim has been asserted.

In support of its argument that the "Asarco dust" statement cannot give rise to a cognizable defamation claim, Regional Council cites a YouTube video and photographs. Regional Council maintains that this evidence "undisputably" supports its argument that the "Asarco dust" statements were truthful. Dkt. 46 at 9. The Court declines Regional Council's apparent invitation to take judicial notice of a YouTube video and photographs of dust being released into the community. *See Mack*, *supra*; *see also* Fed. R. Evid. 201(b). Clearly, there are questions of authenticity regarding this proposed evidence, and there appears to be a reasonable dispute concerning the substance of the evidence. Consideration of this evidence is not proper for purposes of deciding a Rule 12(c) motion.

Whether Silver Cloud has asserted a cognizable defamation claim may present a closer question. The Court concludes that, at this stage of the litigation, Silver Cloud's defamation claim should proceed. It would be premature to determine that these statements, as well as others that may later be discovered, are not defamatory absent further development of the facts. The Court also notes that Plaintiffs maintain that Defendants continue to engage in allegedly wrongful conduct during the course of this litigation.

### F. PLAINTIFFS' CLAIMS BASED ON JOBS WITH JUSTICE CONDUCT

Finally, Regional Council moves to dismiss Plaintiffs' claims to the extent they are based on a theory of vicarious liability for JWJ's alleged conduct.

The Court concludes that it would be improper to address the issue of vicarious liability at this time. Judgment on the pleadings is proper when the moving party establishes that "no material issue of fact remains to be resolved" with regard to a particular claim. *See Hal Roach, supra*; *see also National Cas. Co. v. Lockheed Martin Corp.*, 415 F. Supp. 2d 596, 601 (D. Md. 2006) (a claim may be dismissed as a matter of

ORDER - 18

law only if the claim lacks a cognizable legal theory or if it alleges insufficient facts to support a cognizable legal theory). In other words, the Court should not attempt to determine whether each individual asserted legal theory plausibly supports a claim. Rather, the Court should determine whether *any* legal theory or set of alleged facts plausibly supports a claim. In this case, determining the viability of Plaintiffs' claims against Regional Council based on JWJ's conduct would not resolve the issue of whether the asserted facts support any of Plaintiffs' claims.

## G. CONVERSION OF MOTION

The Court declines to convert Regional Council's motion for judgment on the pleadings into a motion for summary judgment for those claims that have not been dismissed by this order. *See, e.g., 701 NPB Associates v. Federal Deposit Ins. Corp.*, 779 F. Supp. 1336, 1338 (S.D. Fla.1991) (declining to convert motion to dismiss into a motion for summary judgment").

The parties recently filed a Joint Status Report, and discovery has only recently commenced. It would be premature at this stage to renote Regional Council's motion as a motion for summary judgment. Doing so may also muddle the record by allowing supplemental briefing rather than new briefing. Therefore, the Court denies Regional Council's motions as to the claims the Court has allowed to proceed, and Regional Council may file a dispositive motion at a later date if warranted.

## IV. ORDER

Therefore, it is hereby **ORDERED** Regional Council's motion for judgment on the pleadings as to Silver Cloud's claims (Dkt. 26) is **GRANTED in part** and **DENIED in part**, as follows:

(1) Silver Cloud's claims for tortious interference with contract and for tortious interference with business expectancy are **DISMISSED**;

(2) Silver Cloud's remaining claims may proceed.

It is further **ORDERED** that Regional Council's motion for judgment on the pleadings as to Point Ruston's claims (Dkt. 36) is **GRANTED in part** and **DENIED in part**, as follows:

(1) Point Ruston's claims for tortious interference with contract and for tortious interference with business expectancy are **DISMISSED**;

(2) Point Ruston's remaining claims may proceed.

DATED this 8th day of September, 2009.

BENJAMIN H. SETTLE
United States District Judge

ORDER - 20