UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| POINT RUSTON, LLC, et al., | |
| Plaintiffs, | CASE NO. C09-5232BHS |
| v. | |
| PACIFIC NORTHWEST REGIONAL COUNCIL OF THE UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, et al., | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS FOR § 303 VIOLATION, TRESPASS AND TRESPASS TO CHATTELS |
| Defendants. | |

This matter comes before the Court on Defendants' (collectively, the "Carpenters") motion for summary judgment (Dkt. 351) on Plaintiffs Point Ruston, LLC and Mike Cohen's (collectively "Point Ruston") claims under § 303 of the Labor Management Relations Act ("LMRA") and claims for trespass and trespass to chattels. The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby grants in part and denies in part the Carpenters' motion (Dkt. 351).

ORDER - 1

# I. PROCEDURAL HISTORY

On July 9, 2010, the Carpenters moved for summary judgment on Point Ruston's claims for damages under § 303 and its state law tort claims of trespass and trespass to chattels. Dkt. 351. On August 2, 2010, Point Ruston responded in opposition. Dkt. 380. On August 6, 2010, the Carpenters replied.

# II. FACTUAL BACKGROUND

Point Ruston, LLC is a general construction contractor and property developer formed to provide management, development, and oversight services for the Point Ruston project. Dkt. 76. The Point Ruston project is a master planned, mixed-use development constructed on a 97-acre site in Ruston, Washington, along the shores of Washington's Puget Sound adjacent to Tacoma, Washington.

From 1890 to 1986 the 97-acre parcel contained a facility that functioned as a lead and copper smelter. *Id*. Asarco was the owner of the facility for the vast majority of those years, with the site producing almost 10% of the nation's copper. *Id*. In 1981, the Environmental Protection Agency ("EPA") included the Asarco property on their interim priority list. *Id*. Two years later, the EPA officially designated the land as a superfund site on the National Priorities List. According to the EPA, the parcel contains certain levels of arsenic and lead. *Id*. (citing Dkt. 43 at 6 (Declaration of Loren Cohen)). In 2006, Point Ruston purchased the property from Asarco during a bankruptcy proceeding, and assumed Asarco's environmental remediation liabilities for the property and other adjacent sites. *Id*.

In the spring of 2008, Point Ruston entered into an agreement with Rain City Contractors, Inc. ("Rain City") to provide construction of concrete foundations and other concrete structures. While all other contractors retained by Point Ruston in 2008 were union contractors, Rain City was not a unionized employer. After Point Ruston contracted with Rain City, the Carpenters, a labor organization, informed Point Ruston that it had

a labor dispute with Rain City, "and that if Point Ruston continued to use Rain City on the project then the Regional Council would have a dispute with Point Ruston as well." Dkt. 1 at 7 (Plaintiffs' complaint). On June 2, 2008, Regional Council representatives met with Point Ruston and Rain City representatives. *Id.* During this meeting, Defendant Jimmy Matta ("Matta") of Regional Council informed Rain City that it would benefit from entering into a collective bargaining agreement with Regional Council. *Id.* at 8. Matta stated that Rain City would benefit from such an arrangement in part because Matta would "stop harassing [Rain City], leave you alone, and not spank you," and went on to describe how he had previously "spanked" a different contractor because they were non-union. *Id.*

When Point Ruston refused to break its contract with Rain City, demonstrators, which included members of the Carpenters, began appearing at Point Ruston's construction site and sales center and handed out flyers and leaflets prepared by the Carpenters and Jobs with Justice Education Fund of Washington State ("JWJ").[1] *Id.* at 9. On other occasions, the demonstrators brought large signs, banners, or other objects. *Id.* The banners complained of contained statements such as: "Is Mike Cohen Poisoning Our Community?" and "Point Ruston - Poisoned Urban Village." *See, e.g.,* T. Rusher. Decl. Exs. 7, 8. The banners also contained in smaller print the phrase "Labor Dispute." *See, e.g., id*.

Point Ruston also alleges that "employees, representatives or agents" of the Carpenters handed out leaflets on various occasions, which included the following statements:

- "[W]hatever you do, don't go to Point Ruston. It will kill you." *Id.* at 9.
- "It's a view to die for – buyers beware." *Id.*

---

[1] JWJ is no longer a party to this action.

ORDER - 3

- "SHAME ON Mike Cohen & Rain City for spreading poison! . . . Two years ago, Mike Cohen agreed to clean-up the contamination left by Asarco. Now workers on his site employed by Rain City . . . are being exposed to poisons. Now Asarco dust and dirt are being released into the community." *Id*. at 10.

- Point Ruston has "expose[d] . . . workers and nearby residents to toxic poisons . . . [has taken] taxpayer funds to build a luxury village . . . [and has] corrupt[ed] our democracy through . . . pay-offs, union-busters, and threats of raids . . . ." *Id*. at 11.

Point Ruston further alleges the following with respect to the Carpenters' March 26, 2009, picketing and its prior and subsequent bannering and handbilling:

> On March 26, 2009, the Carpenters engaged in a mass picket at the company's south gate of its Point Ruston project (L. Cohen Tr. 164:7-9; 172:6-15). Point Ruston, its management, employees, subcontractors, and sales persons . . . were impeded, blocked, and intimidated by the pickets as they attempted to enter the work site (T. Rusher Decl. Ex. 1).
> When . . . Loren Cohen arrived at the project site on March 26, 2009, he was confronted by a big group of Carpenters demonstrators and picketers of approximately 80 people (L. Cohen Tr. 173:21-24; 174:1-9). One was doing a 'Nazi goose step' in place in front of Loren Cohen's car (L. Cohen Tr. 165:2-23; Heidi King ("King") Decl. Ex. G., Video 1). Another protestor raised his hand up and was 'right dead center' forcing Cohen to stop (L. Cohen Tr. 174:22-23). Because of safety concerns, Cohen got out of his vehicle and tried to speak with the union representative in charge but the protestors were 'gathering around' him and began 'slowly inching up' on him (L. Cohen Tr. 177:18-24; T. Rusher Decl. Ex. 2). Cohen was intimidated by their sheer numbers when they circled him (L. Cohen Tr. 177:24-25; 178:1-3; 179:10-12).
> The Carpenters also blocked entry of subcontractors, including a union subcontractor, City Electric (L. Cohen Tr. 197:3-15; 198; 17-24; T. Rusher Decl. Ex 3 [(picture of City Electric van being impeded in its entrance of the site by picketers)].
> The Picketers were extremely loud and used chants, loud whistles, drums, bull horns, sirens, and other noise makers and, as a consequence, the noise registered on the company's noise monitoring devices over half a mile away (L. Cohen Tr. 176:6-15). When Cohen lowered his window, a demonstrator made a loud piercing directly through the window opening (L. Cohen Tr. 175:9-14).

Dkt. 380 at 2-3. The Court takes these facts in the light most favorable to the nonmoving party and, having reviewed the record, concludes that these facts, as pleaded, are adequately supported in the record.

ORDER - 4

Additionally, Point Ruston alleges that the Carpenters' representatives on occasion committed the state law torts of trespass and trespass to chattels. *See* Dkt. 380 at 17-21 (citing instances in the record that may support these state law tort claims).

### III. DISCUSSION

**A.    Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The

nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson,* 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B.     Trespass & Trespass to Chattels**

The Carpenters move for summary judgment on Point Ruston's claim for trespass and trespass to chattels, which are state law tort claims.

The Norris-LaGuardia Act § 6 "applies to federal court adjudications of state tort claims arising out of labor disputes, whether or not they are associated with claims under [§] 303 to which the section does not apply." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 737 (1966). The parties agree and there is no doubt that the matters between Point Ruston and the Carpenters arose out of a labor dispute. Therefore, the Carpenters' liability for its purported agents is governed by Norris-LaGuardia Act § 6, which provides as follows:

> No officer or member of any association or organization, and no association or organization *participating or interested in a labor dispute*, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

29 U.S.C. § 106 (emphasis added).[2]

---

[2]In *Gibbs* the Supreme Court articulated the purpose and meaning of Section 6:
  The driving force behind § 6 . . . was the fear that unions might be destroyed if they could be held liable for damage done by acts beyond their practical control . . . . Although the statute does not define "clear proof," its history and rationale suggest that Congress meant at least to signify a meaning like that commonly accorded such similar phrases as "clear, unequivocal, and convincing proof."
383 U.S. at 736-37.

ORDER - 6

To succeed on its state tort claims, Point Ruston must prove its claims by clear and convincing proof that the Carpenters participated in, actually authorized, or ratified the violations alleged to have been committed by its officers or members. *Yarbrough v. United Steelworkers of America*, 125 F.3d 1160, 1162 (8th Cir. 1997) (relying on *Gibbs*, 383 U.S. at 736-37). This burden of proof requires Point Ruston to "persuade by a substantial margin, to come forward with 'more than a bare preponderance of the evidence to prevail.'" *Gibbs*, 383 U.S. at 737 (quoting *Schneiderman v. United States*, 320 U.S. 118, 125 (1976)). To survive the Carpenters' motion for summary judgment Point Ruston must at least establish "evidence from which reasonable inferences might be drawn to support [a fact finder's] determination of the [Carpenters'] participation, authorization, or ratification" after actual knowledge thereof that its officers or members engaged in the unlawful acts of trespass or trespass to chattels. *Yarbrough*, 125 F.3d at 1162; *see also Fry v. Airline Pilots Ass'n, Intern.* 88 F.3d 831, 842 (10th Cir. 1996) (citing *Carbon Fuel Co. v. United Mine Workers*, 444 U.S. 212, 217 n. 6 (1979). In *Fry,* the Tenth Circuit reversed the district court's finding that sufficient evidence linked the acts of the representatives with the union. In doing so, it reasoned that "the record does not show any *clear, unequivocal link* between any of these [alleged acts and the union]." *Fry*, 88 F.3d at 842 (emphasis added).

In its opposition to the Carpenters' summary judgment motion on its trespass and trespass to chattel claims, Point Ruston does not address the Norris-LaGuardia Act. *See* Dkt. 380. Its response does not offer a different rule to be applied, nor could such an alternate rule be offered. *See Gibbs*, 383 U.S. at 737. Instead, Point Ruston focuses its analysis solely on pleading its trespass and trespass to chattels claims, which is fatal. Point Ruston has not adequately established a material question of fact as to whether the Carpenters unequivocally participated, authorized, or ratified those alleged acts. *See Fry*, 88 F.3d at 842.

ORDER - 7

Therefore, because the Court must apply the Norris-La Guardian Act § 6, and the cases interpreting it govern this case, the Court grants summary judgment in favor of the Carpenters on the issues of trespass and trespass to chattels.

**C.    Section 303**

"Congress has provided a judicial damage remedy for illegal secondary activity in Section 303 of the Labor Management Relations Act of 1947, 29 U.S.C. § 187." *Shepard v. N.L.R.B.*, 459 U.S. 344, 351 (1983). Section 303(a) of the LMRA makes it unlawful for a union to engage in any activity or conduct defined as an unfair labor practice under § 8(b)(4) of the of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(4), which prohibits secondary boycotts.

Section 303(b) provides that whoever is injured in his business or property because of a violation of § 303(a) may sue in a federal district court "and shall recover the damages by him sustained and the cost of the suit." *Id*. To determine whether activity is secondary and violates the law, the facts must be viewed in the totality of the circumstances. *See Constar, Inc., v. Plumbers Local 447*, 748 F.2d 520, 522 (9th Cir. 1984).

Absent exceptions *not applicable* to Point Ruston's § 303 claim, a union will be responsible for the conduct of its agents when that conduct gives rise to a § 303 claim. *See, e.g., Hasbrouck v. Sheet Metal Workers Local 232*, 586 F.2d 691, 693 (9th Cir. 1978) (applying common law agency to hold that a union is liable for the acts of its agents). A labor union is also accountable for the foreseeable consequences of its conduct, and that of its agents. *See, e.g., Int'l Longshoremen's Ass'n, AFL-CIO v. Allied Int'l, Inc.*, 456 U.S. 212, 224 (1982) (*Longshoremen*).

The Carpenters move for summary judgment on Point Ruston's § 303 claim because they maintain that "[t]here is no triable issue of material fact as to Point Ruston's" claim on this issue. Dkt. 351 at 1. In opposition, Point Ruston argues it is

persuing two theories to support its § 303 claim: (1) violation of § 8(b)(4)(D), jurisdictional disputes; and (2) § 8(b)(4)(ii)(B), unlawful secondary boycott activity.

### 1. Section 8(b)(4)(D)

"Section 8(b)(4)(D) makes it an unfair labor practice for a labor organization to strike or threaten or coerce an employer or other person in order to force or require an employer to assign particular work to one group of employees rather than to another." *N.L.R.B. v. Plasterers' Local Union No. 79, Operative Plasterers' & Cement Masons Int'l Ass'n, AFL-CIO, et al.*, 404 U.S. 116, 123 (1971).

The Carpenters do not attack the facts relied upon by Point Ruston; rather, they take the position that Point Ruston's theory based on a jurisdictional dispute theory fails as a matter of law, arguing that § 8(b)(4)(D) requires a jurisdictional dispute between competing unions. Dkt. 401 at 8. The Carpenters argue that, since Rain City was non-union, a jurisdictional dispute cannot arise because the facts here concern a dispute between a union and a non-union as to who is entitled to the work. *See id.* (citing *Foley-Wismer & Becker v. N.L.R.B.*, 695 F.2d 424, 427 (9th Cir. 1982)).

However, section 8(b)(4)(D) demands *only that two groups* of competing employee groups dispute the entitlement to perform particular work. *N.L.R.B. v. Radio Engineers Local 1212*, 364 U.S. 573, 584 (1961) (§ 8(b)(4)(D) "extends to jurisdictional disputes between unions and unorganized groups as well as to disputes between two or more unions" ); *see also Shank/Balfour Beatty, a Joint Venture of M.L. Shank, Co. Inc., and Balfour Beatty Constr., Inc. v. Int'l Brotherhood of Electrical Workers Local 99, a/k/a/ IBEW Local 99*, 497 F.3d 83, 91 (1st Cir. 2007) ("For a jurisdictional dispute to exist, competing groups (*usually unions*) must make claims to the work at issue.") (emphasis added).

ORDER - 9

Based on the case law, the Court concludes that a jurisdictional dispute under § 8(b)(4)(D) can arise between a union and an unorganized group. *See id*. Therefore, the Court denies the Carpenters' motion for summary judgment on this issue.

### 2. Section 8(b)(4)(ii)(B)

Section 8(b)(4) of the NLRA provides in pertinent part:

> It shall be an unfair labor practice for a labor organization or its agents . . . (ii) to threaten, coerce, or restrain any person . . ., where in either case an object thereof is-
> \*\*\*
> (B) forcing or requiring any person to cease . . . *doing business with any other person* . . . .

29 U.S.C. § 158(b)(4) (emphasis added).

Generally, a union's activities (i.e., demonstrations) are protected by the First Amendment. However, "[t]he Supreme Court has held repeatedly that activities covered by § 8(b)(4)(ii) . . . are not sheltered by the first amendment . . . ." *see, e.g., Boxhorn's Big Muskego Gun Club, Inc. v. Electric Workers Local 494, et. al*, 798 F.2d 1016, 1021 (7th Cir. 1986); *see also Longshoremen*, 456 U.S. at 226. Thus, if the Carpenters' actions violated § 8(b)(4)(ii)(B), the First Amendment will not shield their actions from a valid § 303 claim for damages. *See id.*

Determining whether a union's activities constitute threatening and coercive conduct in violation of 8(b)(4)(ii) is complex and must be done with caution. A court should not give the words "threatening" and "coercive," which are nonspecific and vague, a broad sweep, but should remember that "coercion" under 8(b)(4)(ii) is an elastic concept. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 578 (1988) (quoting *NLRB v. Drivers, Chauffeurs, Helpers, Local Union No. 639*, 362 U.S. 274, 290 (1962) ("*Boston Deliveries*")); *see also Pye v. Teamsters Local Union No. 122*, 61 F.3d 1013, 1024 (1st Cir. 1995) (wide variety of activity falls within conceptual ambit of section 8(b)(4)(ii)). It must be evaluated

pragmatically, "looking to the nature of the coercive conduct, not to the label which it bears." (quoting *Boston Deliveries*, 831 F.2d at 1153)); *see also NLRB v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 689 (1951).

The critical inquiry is whether the union's conduct was intended to bring about an unlawful object. When any part of the intent is prohibited, the activity as a whole is unlawful. *See, e.g., Boston Deliveries*, 831 F.2d at 1152. The First Circuit has set out the appropriate inquiry: whether the pressure being "applied to force a change in the policies of the directly affected (i.e., the 'primary') employer or some other, more remote (i.e., the 'secondary') employer?" *Id.* Put otherwise, if the conclusion is the latter of the above inquiry, "the conduct is proscribed – 'secondary'. . . ." *Id.* (citation omitted). In *Boston Deliveries*, the court upheld the Board's findings that "Local 25's armtwisting was secondary because it was aimed at and in furtherance of the union's dispute with Sears-notwithstanding that Bodeli's arm alone was being bent." The Local's conduct was determined to be done with an improper objective, thereby violating § 8(b)(4).

Therefore, to survive summary judgment, Point Ruston must establish that a material question of fact exists as to whether the Carpenters engaged in impermissible conduct with an impermissible secondary objective. With these principles in mind, the Court now turns to the facts alleged by Point Ruston.

### a. Picketing

Point Ruston argues that the picketing that occurred on March 26, 2009, violated § 8(b)(4)(ii)(B). Dkt. 380 at 7. In opposition, the Carpenters argue that the picketing that occurred on that day was a primary picket against Rain City and, therefore, lawful and not in violation of § 303. Dkt. 351 at 13.

Point Ruston argues that "[l]awful picketing may occur only when the primary employer is on the common site and engaged in its normal business at the situs (*Moore Dry Dock* tests)." *Id*. at 9; *see also Sailors Union of the Pac. (Moore Dry Dock Co.)*, 92

NLRB 547, 27 LRRM 1108 (1950). The *Moore Drydock* standards are to be used as an evidentiary tool. *Constar, Inc. v. Plumbers Local 447*, 568 F. Supp. 1440, 1444 (collecting cases). The four *Moore Dry Dock* criteria to determine if picketing at a common situs is primary, i.e., lawful, are as follows: (a) The picketing is strictly limited to times when the situs of dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the situs; (c) the picketing is limited to places reasonably close to the location of the situs; and (d) the picketing discloses clearly that the dispute is with the primary employer. *Moore Dry Dock*, 92 NLRB at 549 (footnotes omitted); *see also N.L.R.B. v. Ironworkers Local 433*, 850 F.2d at 554. A failure to comply with the *Moore Dry Dock* criteria is not a per se violation of the law; rather, courts must look to the totality of the circumstances to see whether secondary intent is shown. *Constar,* 748 F.2d at 522. In *Constar*, the Ninth Circuit noted that, "although noncompliance with the *Moore Dry Dock* rules may provide evidence of illegal secondary intent, the rules should not be 'mechanically applied so that a violation of one of the standards [is] taken to be presumptive of illegal activity.'" *Id*. (quoting *Local 761, Int'l Union of Elec., Radio and Mach. Workers, AFL-CIO v. NLRB,* 366 U.S. 667, 677 (1961)). While noncompliance of one or more of the *Moore Dry Dock* criteria may not be used to establish a presumption of illegal activity, failing to meet one of the criterium is evidence which a jury can use in making a reasonable inference as to whether conduct constituted illegal secondary activity. *See, e.g., id*.

Point Ruston argues that the second criterium of the *Moore Dry Dock* analytical framework is not met, that the Carpenters' picket on March 26, 2009, occurred when Rain City was not at the situs. Dkt. 380 at 10. Point Ruston supports their argument by reliance on the testimony of Loren Cohen, wherein he had informed Jimmy Matta, a Carpenter representative, that Rain City was no longer engaged and that Diamond Concrete, a unionized employer, was on site. *See id.* (citing L. Cohen Tr. 169:4-25); *see also*

ORDER - 12

Diamond Tr. 54:8-9; 97:4-14 (Diamond Concrete was solely responsible for the concrete work at Point Ruston on the day of the picket).

In opposition, the Carpenters argue that Rain City employees were, in fact, on the situs – the Point Ruston property. Dkt. 401 at 7. The Carpenters submit three pieces of evidence to support this claim. First, they point to what appears to be a sign-in sheet that contains an illegible signature and that the signatory signed in for Rain City on the day of the picket. *See* Dkt. 339, Ex. 8. Second, they rely on the deposition of Ed Diamond (owner of Diamond Concrete), wherein he testifies that Josh Judge (Rain City's saftey officer) was at the site that day. *Id.* at Ex. 32, Diamond Tr. 70:22-71:6; 73:10-14). Finally they rely on the deposition of Tim Rusher (health and safety compliance officer of Point Ruston), wherein he testified that he spoke to Carlos, the foreman for Rain City, that day at the site. Dkt. 337, Ex. 35, Rusher Tr. 69:9-23; *see also* Declaration of Tim Rusher (Rusher Decl.) ¶ 2 (noting his position with Point Ruston).

While the Carpenters' version of the facts may support a conclusion that at least some of the Rain City employees were on the site on the day of the picket, the second part of the *Moore Dry Dock* framework is that the primary employer be engaged in its normal business at the site. Here, it is unclear whether Rain City was still engaged at the site or whether Diamond Concrete was the employer on site.

Because the Court cannot determine which version of the facts is correct, it must view the facts in the light most favorable to Point Ruston. Point Ruston has sufficiently argued that the *Moore Dry Dock* criteria may not be met in this case, which gives rise to a material question of fact as to whether the Carpenters' picket was based on an illegal secondary objective. Further, because a fact finder must make conclusions based on the totality of the circumstances, this issue must remain for the jury.

ORDER - 13

### b. Handbilling & Bannering

The Carpenters contend that their handbilling and bannering does not raise a triable issue of fact as to whether they engaged in these activities with an improper intent that would violate § 8(b)(4). *See, e.g.,* Dkt. 401 at 9-13. In opposition, Point Ruston argues that the Carpenters violated § 8(b)(4) with their handbilling and bannering because (1) it followed improper picketing; (2) it was the functional equivalent of picketing; and/or (3) it took place, at times, on private property.

#### i. Handbills/Banners After Unlawful Picketing

Point Ruston argues that handbilling/bannering that follows unlawful picketing is the functional equivalent of picketing and therefore unlawful under § 8(b)(4). Dkt. 380 at 11 (citing *Broadcast Employees Local 31 (CBS, Inc.), 237 NLRB 1370* (1978), *enforced*, 631 F.2d 944 (D.C. Cir. 1980)). However, Point Ruston's reliance on *Broadcast Employees* is misplaced, as the facts are distinguishable. In *Broadcast Employees*, the handbilling occurred coextensively with the picketing, the handbills were passed out at a neutral entrance and the picketing occurred at a designated union gate entrance. 631 F.2d at 948. Further, the *Broadcast Employees* court determined that the handbills were designed to make persons aware of the picket going on simultaneously.

The Court concludes that, while at least one court has held handbilling to be unlawful when coextensive with a picket, the facts of this case cannot support such a conclusion. Therefore, Point Ruston's arguments on this issue fail.

#### ii. Functional Equivalent of Picketing

With respect to Point Ruston's "functional equivalent" argument, it contends that "[h]andbilling [or bannering] is unprotected if it is not truthful or if the message is deceptive." *See* Dkt. 380 at 11 (citing *Hospital & Serv. Employees Union, Local 399, Serv. Employees Int'l Union, AFL-CIO v. N.L.R.B.,* 743 F.2d 1417, 1424-25 (9th Cir.

ORDER - 14

1984); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340 (1974)). However, these cases do not stand for the proposition cited by Point Ruston.

In *Hospital*, while the holding pertained to the truthfulness of the handbills, it was limited to whether the handbills properly identified the primary dispute, i.e., who the dispute was between. 743 F.2d at 1421. The issue in *Hospital* involved the handbill's failure to meet the requirements of the publicity provisio in § 8(b)(4), which is not at issue in this matter. Therefore, *Hospital* is distinguishable on its facts.

*Gertz* is completely inapplicable to Point Ruston's § 8(b)(4) claim because it pertained to defamation, not to a § 8(b)(4) violation. 418 U.S. at 340. Indeed, *Gertz* does not even mention § 8(b)(4) or secondary boycotts. Its holding is limited to a defamation action and to use its holding with respect to a § 8(b)(4) claim would conflate the standards of the two discrete issues. Therefore, Point Ruston's reliance on *Gertz* to establish a § 8(b)(4) violation is misplaced.

Finally, as a general matter, bannering (or handbilling) has not been held to constitute the functional equivalent of picketing merely because the language found therein is false or misleading. *See Kohn v. Southwest Regional Council of Carpenters*, 289 F. Supp. 2d 1155, 1168 (C.D. Cal., 2003) (discussing Ninth Circuit law from *San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230 (9th Cir. 1997)). In *San Antonio Cmty.,* the Ninth Circuit considered the banner at issue in light of a defamation claim, not a § 8(b)(4) violation. *See San Antonio Cmty.,* 125 F.3d 1230 (leaving the Hospital's defamation claims as the only possible basis for injunction); *Accord*, *Kohn*, 289 F. Supp. 2d at 1168 (§ 8(b)(4)(ii)(B) does not specifically prohibit fraudulent speech, but only threatening, coercive, or restraining conduct that has an unlawful secondary objective).

Therefore, Point Ruston's "functional equivalent" argument as pleaded fails as a basis to establish a § 8(b)(4) violation.

ORDER - 15

### iii. Handbills/Bannering on Private Property

Point Ruston seems to argue that handbilling/bannering on private property is a violation of § 8(b)(4). *See* Dkt. 380 at 12.  However, the cases cited by Point Ruston to support this claim do not pertain to secondary boycotts. *See Lechmere, Inc. v. NLRB*, 502 U.S. 527, 533-34, 139 LRRM 2225, 2228 (1992) (concerning § 7 of the NLRA); *Sparks Nugget dba John Ascuaga's Nugget v. NLRB*, 968 F.2d 991, 140 LRRM 2747 (9th Cir. 1992) (applying *Lechmere* and pertaining to § 8(a)(5), not § 8(b)(4)). Point Ruston's reliance on these cases is misplaced.

Therefore, the Court concludes Point Ruston's "private property" theory fails as pleaded.

### c. Conclusion

Although several of the theories on which Point Ruston has attempted to predicate its § 303 claim are herein rejected as a matter of law, Point Ruston has pleaded sufficient facts to survive summary judgment on this issue; therefore, the jury will have an opportunity to determine whether, under the totality of the circumstances, the Carpenters engaged in picketing, bannering, and handbilling in a manner that was threatening, coercive, or restraining while having an unlawful secondary objective, which would violate § 8(b)(4).

As for damages, Point Ruston has sufficiently pled the issue of damages, which remains an issue for the jury. *See Maxey v. Butchers' Union Local No. 126*, 627 F.2d 912, 915 (9th Cir. 1980) (issue of damages is a question of fact).

**IV. ORDER**

Therefore, it is hereby

**ORDERED** that the Carpenters' motion for summary judgment on Point Ruston's § 303 claim (Dkt. 351) is **GRANTED in part** and **DENIED in part** as discussed herein.

DATED this 10th day of September, 2010.

_[signature]_
BENJAMIN H. SETTLE
United States District Judge

ORDER - 17