1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

POINT RUSTON, LLC, et al.,

10                           Plaintiffs,                    CASE NO. C09-5232BHS

11          v.

12
PACIFIC NORTHWEST REGIONAL                ORDER DENYING
13  COUNCIL OF THE UNITED                    DEFENDANTS' MOTION
    BROTHERHOOD OF CARPENTERS               FOR SUMMARY JUDGMENT
14  AND JOINERS OF AMERICA, et al.,         ON PLAINTIFFS'
                                            DEFAMATION CLAIM
15                           Defendants.

16

17

18

19          This matter comes before the Court on Defendants' (collectively, the

20  "Carpenters") motion for summary judgment (Dkt. 353) on Plaintiffs Point Ruston, LLC

21  and Mike Cohen's (collectively "Point Ruston") defamation claim. The Court has

22  considered the pleadings filed in support of and in opposition to the motions and the

23  remainder of the file and hereby denies the Carpenters' motion (Dkt. 353).

24                          **I. PROCEDURAL HISTORY**

25          On July 12, 2010, the Carpenters moved for summary judgment on Point Ruston's

26  claims for defamation against Mike Cohen ("Cohen") and Point Ruston, LLC. Dkt. 353.

27

28

On August 2, 2010, Point Ruston responded in opposition. Dkt. 373. On August 6, 2010, the Carpenters replied. Dkt. 405.

## II. FACTUAL BACKGROUND

Point Ruston, LLC is a general construction contractor and property developer formed by Cohen to provide management, development, and oversight services for the Point Ruston project. Dkt. 76. The Point Ruston project is a master planned, mixed-use development constructed on a 97-acre site in Ruston, Washington, along the shores of the Puget Sound, adjacent to Tacoma, Washington.

From 1890 to 1986 the 97-acre parcel contained a facility that functioned as a lead and copper smelter. *Id*. Asarco was the owner of the facility for the vast majority of those years, with the site producing almost 10% of the nation's copper. *Id*. In 1981, the Environmental Protection Agency ("EPA") included the Asarco property on their interim priority list. *Id*. Two years later, the EPA officially designated the land as a superfund site on the National Priorities List. According to the EPA, the parcel contains certain levels of arsenic and lead. *Id*. (citing Dkt. 43 at 6 (Declaration of Loren Cohen)). In 2006, Point Ruston purchased the property from Asarco during a bankruptcy proceeding, and assumed Asarco's environmental remediation liabilities for the property and other adjacent sites. *Id*.

In the spring of 2008, Point Ruston entered into an agreement with Rain City Contractors, Inc. ("Rain City") to provide construction of concrete foundations and other concrete structures. While all other contractors retained by Point Ruston in 2008 were union contractors, Rain City was not a unionized employer. After Point Ruston contracted with Rain City, the Carpenters, a labor organization, informed Point Ruston that it had a labor dispute with Rain City, "and that if Point Ruston continued to use Rain City on the

project then the Regional Council would have a dispute with Point Ruston as well." Dkt. 1 at 7 (Plaintiffs' complaint). On June 2, 2008, the Carpenters met with Point Ruston and Rain City representatives. *Id.* During this meeting, Defendant Jimmy Matta ("Matta") of Regional Council informed Rain City that it would benefit from entering into a collective bargaining agreement with Regional Council. *Id.* at 8. Matta stated that Rain City would benefit from such an arrangement in part because Matta would "stop harassing [Rain City], leave you alone, and not spank you," and went on to describe how he had previously "spanked" a different contractor because they were non-union. *Id.*

When Point Ruston refused to break its contract with Rain City, demonstrators, which included members of the Carpenters, began appearing at Point Ruston's construction site and sales center, handing out flyers and leaflets prepared by the Carpenters and Jobs with Justice Education Fund of Washington State ("JWJ").[1] *Id.* at 9. On other occasions, the demonstrators brought large signs, banners, or other objects. *Id.* Point Ruston also takes issue with YouTube videos, other publications, and statements made from the March 26, 2009 picket for which they allege the Carpenters are responsible.

**Banners:** The banners complained of contained statements such as: "Is Mike Cohen Poisoning Our Community?" and "Point Ruston - Poisoned Urban Village?" *See e.g.,* T. Rusher. Decl. Exs. 7, 8. The banners also contained in smaller print the phrase "Labor Dispute." *See, e.g., id.*

**Fliers:** Point Ruston also alleges that "employees, representatives or agents" of the Carpenters handed out leaflets on various occasions, which included the following statements:

---

[1]JWJ is no longer a party to this action.

ORDER - 3

- "[W]hatever you do, don't go to Point Ruston. It will kill you." *Id.* at 9.

- "It's a view to die for – buyers beware." *Id.*

- "SHAME ON Mike Cohen & Rain City for spreading poison! . . . Two years ago, Mike Cohen agreed to clean-up the contamination left by Asarco. Now workers on his site employed by Rain City . . . are being exposed to poisons. Now Asarco dust and dirt are being released into the community." *Id.* at 10.

- "Watch the dust and dirt fly @http://youtube.com/watch?v=RFNIA6oJ5Jw

- "Is Mike Cohen Poisoning Our Community?"

- "Point Ruston Poisoned Urban Village?"

- "Iron Workers Local 86 is circulating a 'facts sheet' concerning questionable developer Mike Cohen"

- "[C]ontaminated soil containing up to 3,000 ppm arsenic and lead contaminations greater than 200 ppm had been spread across the construction site."

- "more workers could have been exposed to high levels of arsenic than this one batch of tests indicates."

- "Is Mike Cohen foregoing safety to turn a large profit?"

- "Tacoma About to Ink Toxic Deal with Questionable Developer of Toxic Land"

- Point Ruston has "expose[d] . . . workers and nearby residents to toxic poisons . . . [has taken] taxpayer funds to build a luxury village . . . [and has] corrupt[ed] our democracy through . . . pay-offs, union-busters, and threats of raids . . . ." *Id.* at 11.

*See, e.g.,* Declaration of Daniel Shanely (Shanely Decl.), Dkt. 203, Ex. 5.

Point Ruston takes issue with statements published in fliers that the Carpenters distributed in connection with Silver Cloud Hotels, *see* Dkt. 430 at 4-5 (order on Silver Cloud defamation claims). These statements include:

- "Rain City Contractors Inc. workers from Point Ruston have tested positive for arsenic."

ORDER - 4

- "If workers are complaining about being subjected to arsenic, is Point Ruston a safe place to build a hotel?"

- "Is Mike Cohen foregoing safety to turn a large profit?"

*See, e.g.,*Declaration of Amy Angel, Dkt. 379, Ex. 1-B.

**YouTube Videos:** The Carpenters distributed several videos via YouTube.com, which Point Ruston claims constituted defamation. *See, e.g.,* Dkt. 373 at 14. On July 21, 2008, the Carpenters posted a YouTube video captioned: "Point Ruston, Tacoma, Workers put their life in danger to maximize profits for developer." Declaration of Heidi King, Dkt. 375, Ex. G (CD-Rom). This July 21, 2008, video also states: "Slag and thousands of tons of smoke has poisoned everything within 5 miles radius of the plant," and "[h]ow many more families will be sacrificed?" *Id.* On August 6, 2008, the Carpenters posted a second YouTube video entitled "Point Ruston Poisoned Urban Village" asking "is Mike Cohen cutting corners for profit?" *Id.*

**Other Publications:** Point Ruston alleges that the Carpenters made false statements in an effort to "link the deaths of three individuals (Raul Sosa, Abel Urbano Ramos, and Daniel Gamez Guillen) to the conditions at Point Ruston site and stating that other workers had 'lost their feet.'" Dkt. 373 (citing M. Cohen Tr. 311:6-13; Angel Decl. Ex. 1-H).

**March 26, 2009 Picket:** Point Ruston alleges that the Carpenters made false statements using the words "inhalation hazard," which were allegedly affixed to the white coveralls worn by some of the picketers while they donned gas masks. Dkt. 373 at 18 (citing Hunt Decl, Ex. 5; King Decl., Ex. G).

Point Ruston contends that each of the foregoing statements were false and constitute defamation of either Cohen or Point Ruston, LLC, or both. *See* Dkt. 373.

# III. DISCUSSION

## A.     Summary Judgment Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt").  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party.  The nonmoving party may not merely state that it will discredit the moving party's evidence at

1  trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec.*

2  *Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson,* 477 U.S. at 255). Conclusory,

3  nonspecific statements in affidavits are not sufficient, and missing facts will not be

4  presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B.    Actual Malice Standard**

The parties do not dispute whether allegedly defamatory statements were made by

the Carpenters; rather they dispute the standard to be applied to Point Ruston's

defamation claims.[2] The Carpenters contend that "actual malice" must be established;

whereas, Point Ruston contends it need only prove defamation under the elements set out

in Washington's law governing libel actions. Alternatively, Point Ruston asserts it is able

to meet the actual malice standard, if applied. *Compare* Dkts. 353 and 373.

"[L]ibel actions under state law [are] pre-empted by the federal labor laws to the

extent that the State [seeks] to make actionable defamatory statements in labor disputes

which were published without knowledge of their falsity or reckless disregard for the

truth." *San Antonio Cmty. Hosp. v. Southern California Dist. Council of Carpenters*, 125

F.3d 1230 (9th Cir. 1997) (quoting *Old Dominion Branch No. 496, Nat. Ass'n of Letter*

*Carriers, AFL-CIO v. Austin* (*Letter Carriers*), 418 U.S. 264, 273 (1974)). This

requirement "is commonly known as the *New York Times* 'actual malice' standard.'" *Id.*

(citing *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)). Therefore, if the dispute

between Point Ruston and the Carpenters qualifies as a "labor dispute," then the "actual

malice" standard is applicable.

---

[2]The Carpenters do argue, however, that some of the allegedly defamatory statements
cannot constitute defamation because they are not of and concerning the Plaintiffs. *See* Dkt. 353
at 17 (regarding YouTube videos). This issue is analyzed below.

To avoid application of the "actual malice" standard, Point Ruston argues their dispute with the Carpenters is not accurately characterized as a labor dispute of the ilk that would require applying the *New York Times* "actual malice standard." Dkt. 373 at 3 (citing *Linn v. United Plant Guard Workers of America, Local 114*, 383 U.S. 53 (1966)). However, Point Ruston incorrectly applies *Linn* to its case.

A "labor dispute" is statutorily defined to include

> any controversy concerning terms, tenure or conditions of employement, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee.

29 U.S.C. § 152(9). The Ninth Circuit has also well clarified what constitutes a "labor dispute" in § 303 cases such as this case. *Overstreet v. United Brotherhood of Carpenters and Joiners of America, Local Union No. 1506*, 409 F.3d 1199 (9th Cir. 2005).

*Overstreet* involved a dispute between a union and three contracting companies that the union contended failed to "meet local labor standards – especially wage standards – on construction projects." 409 F.3d at 1201. When these companies refused to improve the standards, the union took to bannering retailers who had contracted with the primary companies for their construction needs. *Id*. at 1202. The retailers filed suit against the union alleging violations of § 8(b)(4) (secondary boycotts) and also alleged that the banners were fraudulent. In resolving the matter, the *Overstreet* court had occasion to examine what falls under the definition of a "labor dispute." After acknowledging that the primary/secondary employer distinction is the subject for labor law treatises, the Ninth Circuit held that:

> Whatever one might think about the merits of these disputes, all parties involved understand that a dispute does exist between activists and the "secondary" institutions. There is likely to be disagreement, true, over whether the secondary is contributing to the primary's actions in any

ORDER - 8

significant way, or whether the primary's actions are objectionable at all. But any such disagreement does not affect whether, in common parlance, a "dispute" exists concerning maintaining ties with an individual or institution taking controversial action. And, when the specific dispute is whether the secondary institution should sever ties with another company so that the secondary institution does not undermine regional labor standards, *"labor dispute" is a perfectly apt description.*

*Overstreet*, 409 F.3d at 1217 (emphasis added).

Turning back to the present matter, the Court concludes that there is no material difference between the facts in *Overstreet* and the facts of this case when it comes to determining whether a labor dispute exists between the parties. *See id.* In this context, there can be no doubt that the disputants in the present matter are and have been involved in a "labor dispute" for the purposes of determining whether to apply the *New York Times* actual malice standard. *See San Antonio Cmty. Hosp.*, 125 F.3d at 1235 (applying actual malice standard to state law defamation claim in the context of a labor dispute subject to the federal labor laws).

Therefore, the foregoing case law instructs that, to be successful in its state-law defamation action predicated on the Carpenters' statements made during the course of this labor dispute, Point Ruston must satisfy the *New York Times* "actual malice" standard:

> (1) that the allegedly defamatory statement asserts a fact or "impl[ies] an assertion of objective fact," *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990); *see also Linn*, 383 U.S. at 58 n. 2; *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir. 1990); (2) that the factual assertion is false, *Milkovich*, 497 U.S. at 16; *Letter Carriers*, 418 U.S. at 283-84; *Unelko*, 912 F.2d at 1055-56; and (3) that the speaker published the challenged statement with "actual malice." *Letter Carriers*, 418 U.S. at 281; *Linn*, 383 U.S. at 64-65; *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). The First Amendment further requires that the challenged statement be "of and concerning" the complainant. *Sullivan*, 376 U.S. at 288**.**

*Steam Press Holdings, Inc. Hawaii Teamsters, Allied Workers Union, Local 996*, 302 F.3d 998, 1004 (9th Cir. 2002) (citations edited).

"Actual malice" is established when a plaintiff can demonstrate that the defendant published the statement with knowledge of its falsity or with reckless disregard for whether it was false or not. *See, e.g., Sullivan*, 376 U.S. at 280. Stated differently, actual malice may be established through proof that the defendant never believed the publication to be true. To establish malice, which must be proved by clear and convincing evidence, "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence." *Harte-Hanks Comm., Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) (cautioning that a court not place too much weight on such factors).

The presence of "actual malice" is measured at the time of the publication, not based on after-acquired information following the publication of the allegedly defamatory statements. *See, e.g., Sullivan*, 376 U.S. at 286 (concluding the "statement does not indicate malice at the time of publication"). Therefore, in disputing whether any of the alleged statments are defamatory, the Carpenters cannot rely on information obtained after the fact to prove whether they believed the allegedly defamatory statements to be true when made.

Finally, as the Carpenters point out, "courts have held that in determining whether a statement is defamatory or not, '[t]he context in which the [alleged defamatory] statement appears is paramount . . . and in some cases it can be dispositive.'" Dkt. 422 at 7 (quoting *Knievel v. ESPN*, 393 F.3d 1068, 1075 (9th Cir. 2005). . . . [C]ourts have instructed that the entirety of the context of the statement must be considered . . . ." The Court will, therefore, consider the entire context of the present matter when determining whether or not summary judgment is proper with respect to Point Ruston's defamation claims.

1    With these standards in mind, the Court turns to the Carpenters' motion for
2    summary judgment on Point Ruston's defamation claims.

3    **C.    The Carpenters' Motion for Summary Judgment**

4    The Carpenters move the Court to grant summary judgment in their favor on Point
5    Ruston's defamation claims. Dkt. 353. Specifically, the Carpenters contend that their
6    challenged statements are protected and not subject to claims of defamation. In
7    opposition, Point Ruston contends that the Carpenters' allegedly defamatory statements
8    are not protected. Dkt. 373.
9
10   The First Amendment protects "statements that cannot 'reasonably [be] interpreted
11   as stating actual facts' . . . ." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)
12   (quoting *Hustler Magazine v. Falwell*, 485 U.S. 46, 50 (1988)). Thus, the threshold
13   question in defamation suits is "whether a reasonable factfinder could conclude that the
14   statement impl[ies] an assertion of objective fact." *Unelko Corp. v. Rooney*, 912 F.2d
15   1049, 1053 (9th Cir. 1990) (quotation and citation signals omitted); *Milkovich*, 497 U.S.
16   at 21 (noting that the "dispositive question" is whether a "reasonable factfinder" could
17   conclude the alleged defamatory statements imply an assertion of fact).
18
19   To determine whether a statement implies an assertion of objective fact, such that
20   the statement can be found "false and defamatory" under the First Amendment, the Ninth
21   Circuit has set out a three-part test which asks: (1) whether the general tenor of the entire
22   work negates the impression that the defendant was asserting an objective fact; (2)
23   whether the defendant used figurative or hyperbolic language that negates that
24   impression; and (3) whether the statement in question is susceptible to being proved true
25   or false. *Partington v. Bugliosi*, 56 F.3d 1147, 1155-1159 (9th Cir. 1995).
26
27
28

Where figurative language and hyperbole do not imply objective facts, such statements are not actionable as defamation. *See Milkovich*, 497 U.S. at 20 (noting First Amendment protects "imaginative expression" and "rhetorical hyperbole"); *See also Partington*, 56 F.3d at 1157. For example, in *Letter Carriers*, the court found that a union newsletter calling plaintiffs who worked during a strike "traitors" was not libelous because the word was used in a "loose, figurative sense to demonstrate the union's strong disagreement" such that it was "impossible to believe any reader . . . would have understood the newsletter to be charging the [workers] with committing the criminal offense of treason." *Letter Carriers*, 418 U.S. at 284-85; *see also, e.g., Greenbelt Coop. Publ'g Ass'n v. Bressler*, 398 U.S. 6, 13-14 (1970) (holding that the word "blackmail" was "no more than rhetorical hyperbole" that not even a careless reader would understand literally, and therefore, was an improper basis of libel judgment); *Sagan v. Apple Computer, Inc.*, 874 F. Supp. 1072, 1075-76 (C.D. Cal. 1994) (dismissing libel action because no reasonable factfinder could conclude that "Butt-Head Astronomer" implied the fact that plaintiff was a less than able astronomer).

Statements incapable of being proved true or false are not actionable as defamation. *See, e.g., Partington*, 56 F.3d at 1157-58 (finding critiques of a lawyer's performance are subjective statements not susceptible to being proven true or false); *Underwager v. Channel 9 Australia*, 69 F.3d 361, 367 (9th Cir. 1995) (noting that statements reflecting opinions of plaintiff's motivations and personality are not capable of verification); *Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union*, 39 F.3d 191, 196 (8th Cir. 1994), citing *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 774-76 (1986) ("'Unfair' is a term requiring a subjective determination and is therefore incapable of factual proof.").

The Carpenters also argue that their use of a "?" on many of their statements is evidence that they are merely expressing a rhetorical question and leaving interpretation to the reader. *See* Dkt. 353 at 12-13 (relying on *Partington*, 56 F.3d at 1157). In *Partington*, the Ninth Circuit addressed the use of question marks and whether they insulate a speaker from claims of defamation. There, the Ninth Circuit noted:

> Further, at least with regard to the first passage, the rhetorical device used by Bugliosi negates the impression that his statement implied a false assertion of fact. Bugliosi's use of a question mark serves two purpose: it makes clear his lack of definitive knowledge about the issue and invites the reader to consider the possibility of other justifications for the defendants' actions. As the Fourth Circuit noted:
>> A question can conceivably be defamatory, though it must reasonably be read as an assertion of a false fact; inquiry itself, however embarrassing or unpleasant to its subject, is not an accusation. The language cannot be tortured to "make that certain which is in fact uncertain."
> *Chapin*, 993 F.2d at 1094 (citation omitted); *see also Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union*, 39 F.3d 191, 195-96 (8th Cir. 1994). Indeed, the First Circuit has explicitly distinguished a question like Bugliosi's from the statements found actionable in *Milkovich*: "[W]hile the author's readers implicitly were invited to draw their own conclusions from the mixed information provided, the *Milkovich* readers implicitly were told that only one conclusion was possible." *Phantom Touring, Inc.*, 953 F.2d at 731; *see also Beverly Hills Foodland*, 39 F.3d at 196.

*Partington*, 56 F.3d at 1157.

Turning back to the facts of this case, using a "?" at the end of a statement does not automatically insulate the Carpenters from liability for defamation, assuming Point Ruston otherwise prevails on its defamation action. *See id*. The Court also notes that "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed," summary judgment is not appropriate. *McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir. 2009).

A close reading of the facts as set out by both parties reveals that they do not dispute what statements were made; rather, they dispute whether, based on the inferences

that can be drawn, the statements were defamatory and made with actual malice. The Court must view the facts in light of the non-moving party. Thus, for purposes of this motion, the Court adopts Point Ruston's view of the facts, to the extent they set out an actionable case for defamation.

Considering the entire record in this case and the context in which the challenged statements were made, the Court concludes Point Ruston has sufficiently supported their contention that many of the statements made by the Carpenters are properly the subject of their defamation action. That is, they may be provably false, may be objectively verifiable facts, and may have been made with actual malice. The Court need not evaluate each and every point and counter point made by the parties because doing so would simply result in comparing differing versions of the truth, which is not the subject of summary judgment.

That said, the Court does find persuasive Point Ruston's alleged supporting evidence of statements that a jury could find were not only false, or at least deceptively misleading in context, but also that the statements were made with actual malice. As argued by Point Ruston, a jury could find malice because, among other things, the Carpenters "never believed the site was dangerous to workers or the community. Otherwise, [the Carpenters] never would have sought to have members and favored contractors perform work on site." *See* Dkt. 373 at 19 (relying on Prindle Tr. 14:13-17:2; L. Cohen Tr. 120:20-123:23; M. Cohen Tr. 310:3-19; 311:14-21; 315:8-316:6; 341:23-342:8; 406:8-14; 409:21-416; Santory Decl. ¶¶ 3-4) (evidence of the Carpenters' hopes to establish a relationship with Point Ruston and then making alleged threats if they did not get the work).

However, the Court specifically addresses the following statements, which are capable of sustaining Point Ruston's defamation action:

- *"It's a view to die for – buyers beware."* The Court finds this statement to be purely rhetorical hyperbole, opinion, and/or not provably false.

- *"Iron Workers Local 86 is circulating a 'facts sheet' concerning questionable developer Mike Cohen."* The Court finds that whether Mike Cohen is a "questionable developer" is not capable of being proved, is opinion, and is hyperbole.

- *"Tacoma About to Ink Toxic Deal with Questionable Developer of Toxic Land" This statement is partly protected.* The Court finds that the statements "Toxic Deal" and "Questionable Developer" are hyperbole, incapable of proof, and are simply an opinion. **However,** whether Point Ruston, LLC/Cohen are inking a deal with respect to "toxic land" is capable of being proven false when viewed in context and is, therefore, not necessarily hyperbole, rhetoric, or opinion. Therefore, this portion of the statement is subject to Point Ruston's defamation claims.

- The Court finds that whether Cohen is a "troubled developer" is not capable of proof, is hyperbole, and is opinion.

- To the extent statements are addressed specifically to the site and not, at least implicitly, to Point Ruston, LLC or Cohen, such statements are not of and concerning an entity or a person and are, therefore, not actionable. *Sullivan*, 376 U.S. at 288**.**

*See, e.g.,* Declaration of Daniel Shanely (Shanely Decl.), Dkt. 203, Ex. 5 (containing a re-creation of the challenged statements) (emphasis added).

**YouTube Videos:** The Carpenters contend that Point Ruston does not challenge the statements made in certain of the YouTube videos and thereby concede their truth. *See* Dkt. 405 at 4. However, such a concession is not made. *See* Dkt. 373 at 18. In fact, Point Ruston argues that the videos imply that "Mike Cohen and Point Ruston have poisoned the community for many square miles, that they have distributed slag over this vast area, and have generated 'tons' of smoke, and have caused death or illness to familes." *Id*. Point Ruston's argument is well taken given the context in which the YouTube videos arose. Therefore, they are actionable under defamation.

**Other Publications:** Point Ruston alleges that the Carpenters made false statements in an effort to link "the deaths of three individuals (Raul Sosa, Abel Urbano Ramos, and Daniel Gamez Guillen) to the conditions at the Point Ruston site and stating that other workers had 'lost their feet.'" Dkt. 373 (citing M. Cohen Tr. 311:6-13; Angel Decl. Ex. 1-H). These documents appear to reflect that the information relied upon is either double hearsay or standard hearsay. Absent an applicable hearsay exception or the ability of Point Ruston to establish these facts are otherwise admissible as evidence, Point Ruston will not be permitted to raise this issue at trial. The Court reserves ruling on this issue for the parties' motions in limine.

**Inhalation Hazard:** The Carpenters argue that Point Ruston, for the first time in this case, attempts to bring the statement on the overalls of the picketers, "inhalation hazard," into the gambit of evidence on which it supports its defamation claims. Even if the Carpenters were timely made aware of this challenged statement, it is not of and concerning Point Ruston, LLC or Cohen. Therefore, it is not actionable.

**Newspaper Reports:** The Carpenters contend they are not liable for the articles "Photo Message from a Toxic Waste Site" and "Text Message from a Toxic-Waste Site." Dkt. 353 at 19. Absent an exception to hearsay and the ability of Point Ruston to attribute such statements directly to the Carpenters, these statements will not be admissible as evidence of defamation.

## D.   Motions to Strike

The Carpenters move to strike the testimony of Dr. Joyce Tsuji. Dkt. 405 at 3. The Carpenters contend that Dr. Tsuji was not properly disclosed as a precipient/expert witness in accord with the timeline set out by the Court's schedule. The Court did not rely

on the opinions of Dr. Tsuji in reaching its decision herein. Therefore, the Court reserves

ruling on this issue for the parties' motions in limine.

Point Ruston moves to strike the "*Leider* Declaratoins" as hearsay. In their briefing

the Carpenters rely on statements from declarations taken in a separate matter, *Leider, et*

*al. v. Tacoma*, (Pierce County Washington Superior Court, No. 08-2-07862-6). Because

the Court denies the Carpenters' motion for summary judgment herein, the Court need not

address this issue. However, in the event the Carpenters seek to admit this or similar

evidence, it will be subject to the rules of evidence.

**E.     Conclusion**

Based on the foregoing, the Court concludes that Point Ruston has adequately

pleaded an action for defamation, limited to the scope defined herein. In the event a jury

concludes that Point Ruston, LLC or Cohen have been the victims of defamatory

statements made by the Carpenters, the issue of damages (injury) will be a question of

fact for the jury.

**IV. ORDER**

Therefore, it is hereby

**ORDERED** that the Carpenters' motion for summary judmgent on Point Ruston's

defamation claim (Dkt. 353) is **DENIED** as discussed herein.

DATED this 13th day of September, 2010.

_____
BENJAMIN H. SETTLE
United States District Judge